THE FLORIDA, ATLANTIC & GULF CENTRAL R. R. Co., APPELLANTS, vs. THE PENSACOLA & GEORGIA R. R. Co., APPELLEE.

1. Acts passed at the same session of the Legislature are to be taken in *pari materia*, and to receive a construction that will give effect to each if possible. But if each of them cannot have the same entire effect when taken in connection with the other that it would if taken singly, they must be construed as to give effect to what appears to have been the main intention of the Legislature.

2. By the terms used in the third section of the original charter of the Pensacola & Georgia Railroad Company, it is manifest the Legislature intended to confer upon the Board of Directors an unrestricted power to fix the terminus of said road, after leaving Pensacola Bay and running thence eastwardly, anywhere and at any point on the boundary line between the States of Florida and Georgia; and that said Directors have fixed said terminus via Alligator, now called Lake City, the same being in an eastwardly direction to the boundary line of Georgia.

3. Neither the Florida Atlantic & Gulf Central Railroad Company, nor the Pensacola & Georgia Railroad Company had, under their original charter, an ac-

*clusive* right to build their road ; that the route of the Pensacola & Georgia Company, under the original act of incorporation thereof, was authorized to be constructed over the same route as that of the Florida Atlantic & Gulf Central Railroad, *excepting* only that portion thereof from a point near the town of Baldwin to Jacksonville.

4. That the line of road specified in the 4th section of the act known as the "Internal Improvement Act of 1855," is and was over that portion of the route which the said Pensacola & Georgia Railroad Company and said Florida, Atlantic & Gulf Central Railroad Company, by their respective original charter, were authorized to construct a road; excepting that portion from a oint near Baldwin to Jacksonville, which the Florida, Atlantic & Gulf Central Railroad Company had the sole right of constructing. And that after the acceptance of both of said Companies of the provisions of said Internal Imprsvement act, they still maintain their respective right to construct said road thus authorized by their original charter, and both companies had a common right over said route, *excepting* as aforesaid.

5. The Pensacola & Georgia Railroad Company did not derive their authority to build their road to a junction with the Florida, Atlantic & Gulf Central road at or in the vicinity of Alligator solely from the act amending their charter, passed 15th December, 1855, but that authority was conferred upon them in their original charter, the said amendment being but a re-enactment, in this respect, of power which before existed.

6. The rules of interpretation, applicable to ordinary statutes, grants or contracts, are not the same as those interpreting grants of franchise, the latter being a]much more enlarged one in favor of the public, consequently a mere ambiguity in the charter of such corporation is alone in any case sufficient to determine its meaning against the corporation and in favor of the public.

7. The 24th section of the said Internal Improvement act authorizes the building of a Branch road from the main line therein provided to the northern boundary line of this State, east of the Alapaha river, so soon as that part of the line between the Suwannee river and the Florida Road was constructed, and the building of said Branch Road was not restricted until the completion of the entire line from Pensacola.

8. The road authorized to be built by the Pensacola & Georgia Railroad Company, in the amendment of their charter, is not a lateral road nor an extension of the main line of said road, but is a branch road.

9. No *legislative* contract with the Florida, Atlantic & Gulf Central Railroad Company was violated, altered or impaired by the Legislature, in the passing of the act of 1859, authorizing the construction of a Branch Road from Houston to the Georgia line. Nor is there any provision in the act of December, 1850, or in any other act of the Legislature, which required the *assent of either* of said companies to the building of said Branch Road.

10. It is the right of an individual or corporation having vested rights to enjoin another corporation, where the damage about to be done is of a permanent

and irreparable character, and especially when the defendants seek to do it under the color of a charter.

11. Upon a careful examination of the bill, answer and exhibits in this case, no evidence appears sufficient to establish the existence of an agreement on the part of the Pensacola & Georgia Railroad Company, that no branch road from the main line east of the Alapaha river should be built by them until the whole line from Pensacola to Jacksonville be constructed ; nor does any such agreement appear to have been ratified and confirmed by the General Assembly.

12. The Florida, Atlantic & Gulf Railroad Company have not surrendered any portion of their franchise or their right of construction of that part of the main line of the road from Pensacola to Jacksonville in any other way than the Pensacola & Georgia Company may have, in a portion thereof, excluded their right of construction by *first occupying* the same and building so much of the main line.

13. Nothing appears in this case to show that the Florida, Atlantic & Gulf Central Railroad Company have not now the same rights in aid of, and powers to construct that portion of the main line of the r ·ad in the 4th section of the Internal Improvement act specified, from Apalachicola river to Pensacola, they had at any time after their acceptance of the provisions of the Internal Improvement act.

This case was decided at Tallahassee.

*Banks & McLeod* and *Wilkerson Call* for Appellant.

*Davis* and *Papy* for Appellee.

FORWARD, J., delivered the opinion of the Court.

The appellants filed their bill in the Circuit Court for the Middle Circuit, setting forth that, by their charter, approved by the Governor of the State of Florida, on the seventh day of January, A. D. 1853, they were authorized to construct a Railroad which should commence in East Florida and run through the State in the most eligible direction to some point, bay, arm, or tributary of the Gulf of Mexico, west of the Apalachicola river in West Florida. That the Pensacola & Georgia Railroad Company, by their charter, approved by the Governor on the eighth day of January, A. D. 1853, were authorized to construct a Railroad from the city of Pensaco-

la, or any other point or points on the waters of the Pensacola Bay, in Florida, and running thence in an eastwardly direction to the western or southern boundary line of the State of Georgia. The bill avers that the said charter of the Pensacola & Georgia Company was granted exclusively to citizens residing *west* of the Apalachicola river, and the road thereby authorized to be built was intended to enter the State of Georgia at or near the south-west corner of the said State, and not otherwise.

The bill further sets forth, that the Legislature of Florida, in obedience to an express requirement of the Constitution of the State of Florida, making it the duty of the General Assembly thereof to encourage Internal Improvements, and to that end to ascertain by law proper objects of improvement, did pass an act, known as the Internal Improvement Act, which was approved on the 6th day of January, A. D. 1855, by which said act it is provided, in the fourth section thereof, that a line of Railroad from the St. Johns river at Jacksonville and the waters of the Pensacola Bay, are proper improvements to be aided from the Internal Improvement Fund, &c.

And further, by the fifth section it is provided, "That the several Railroads now organized or chartered by the Legislature, or that may be hereafter chartered, any portion of whose routes as authorized by their different charters and amendments thereto, shall be within the line or routes laid down in section four, shall have the right and privilege of constructing that part of the line embraced by their charter on giving notice to the Trustees of the Internal Improvement Fund of their full acceptance of the provisions of this act, specifying the part of the route they propose to construct, and upon the refusal or neglect of any Railroad Company now organized to accept within six month from the passage of this act the provisions of the same, any other

company duly authorized by law may undertake the construction of such part of the line as may not be in progress of construction under a previous charter."

The bill avers that at the date of the passage of the Internal Improvement act they and they only were authorized by their charter to build the entire road between Jacksonville and Pensacola, and that no other company whatsoever was in existence, "any portion of whose route as authorized by its charter" was over or within the said line except the said Pensacola & Georgia Company; and the bill further avers that the charter of the said Pensacola & Georgia Company only authorized them to build a road from Pensacola or the waters of Pensacola Bay, in an eastwardly direction, to the *western* or southern boundary line of the State of Georgia.

The bill further alleges that the point where a line from Jacksonville to Pensacola would unite with the Pensacola and Georgia line under their respective charters would have been somewhere west of the Apalachicola river, and avers that the Florida, Atlantic & Gulf Central Railroad Company were consequently exclusively entitled to construct the road from Jacksonville to the Apalachicola river, while their rights were the same as those of the said Pensacola and Georgia Company over that portion of the route lying between the Apalachicola river and Pensacola.

The bill then inserts a copy of the 24th section of the Internal Improvement act and alleges that the object and intention of the introduction of the said 24th section was to induce investments of private capital in the line of Railroad between Jacksonville and Pensacola, by ensuring the companies building any portions of the same against the competition of rival roads to Savannah or otherwise, while the same were in progress of construction and consequently unable to compete on equal terms. The bill further in sub-

150      SUPREME COURT.

Fla., Atl'e & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

stance avers that the right reserved by the General Assembly in the said 24th section, to authorize the construction of a Branch road to the Georgia line east of the Alapaha river, after the road between the Suwannee river and the Florida Railroad was completed, as a right reserved for the benefit of the Florida, Atlantic & Gulf Central Company, with which alone such branch road to the Georgia line east of the Alapaha would compete and would injure.

That relying upon the faith of the said guarantees, the Florida and Gulf Central Company (unable to obtain individual subscriptions of stock to a sufficient amount to enable them to construct their road) were compelled to appeal to the city of Jacksonville and the county of Columbia in their several corporate capacities to become Stockholders, the said city subscribing fifty thousand dollars and the said county one hundred thousand dollars to the capital stock of said Company.

The bill further sets forth that regarding the Internal Improvement act as a contract between the State of Florida and the several railroad companies accepting the provisions thereof, and as such not liable to be altered, rescinded, repealed, or in anywise disregarded, either by the State of Florida or by any of the recipients of its benefits, and that so regarding it, they, the Florida and Gulf Central Company did, within the six months specified, to-wit: on the 2nd May, 1855, give notice to the Trustees of their full acceptance of the provisions of the said act, for the entire line from Jacksonville to Pensacola as they by their charter had a good right to do, and avers that said Florida and Gulf Central Company, thereby became exclusively entitled to all the benefits of the said act for the entire line between Jacksonville and the Apalachicola river, with rights equal to those of the said Pensacola and Georgia Company over the

route west of a point where the said line to Pensacola would unite with the line of the said Pensacola & Georgia road.

The bill also sets forth that the said Pensacola and Georgia Company on the 10th day of February, 1855, likewise determined to accept the provisions of the said Internal Improvement act, which they did by instructing their Secretary " to notify the Trustees of the Internal Improvement " Fund of the acceptance by this Company of the provisions " of the act to provide for and encourage a liberal system of " Internal Improvements in this State, approved January 6th, " 1855, and to specify the route lying between Pensacola or " the waters of Pensacola Bay and the point of intersection " with the Florida Railroad, on the most direct practical " line, to Jacksonville with a view to an extension afterwards " to the Georgia line."

The bill avers that the Pensacola and Georgia Company had no powers under their charter to build a road on such a route as that embraced in their notice of acceptance, saving so much thereof as lay west of the point where a line from Jacksonville to Pensacola would intersect a line from Pensacola to the western or Southern boundary of Georgia.

That the validity of the notice of acceptance, and the rights to be thereunder acquired, depended wholly—

First, Upon the Florida, Atlantic & Gulf Central Rail road Company's relinquishment of their exclusive privileges under their charter and the Internal Improvement act; and

Secondly, Upon a future grant by the General Assembly of the State of Florida of such amendments to the charter of the said Pensacola and Georgia Company as would enable them to locate their road in accordance with the said notice.

The bill further avers that the said notice of acceptance by the said Pensacola and Georgia company was in effect an express abandonment of all their rights, and of all intention to build any road whatever to the Georgia line at any point

until the completion of the route lying between Pensacola and the said intersection with the Florida Railroad. That the benefits received as a condition for this said abandonment by the said Pensacola and Georgia company was the securing the grant of chartered power and the benefits of the said Internal Improvement act, and the relinquishment of the rights of the said Florida, Gulf & Atlantic Central Company over that portion of the route embraced in the said notice, and which was not embraced within the charter of the said Pensacola and Georgia company.

The bill further states that after the said companies had respectively notified the Board of Internal Improvement of their said acceptance, and while they were each contemplating the construction of the road, the said Pensacola & Georgia Road were without any chartered power whatsoever, and without any possibility of obtaining the benefit of the said Internal Improvement act, (except by the assent of the appellants,) contemplating the construction of the greater part of the same road; that the Florida, Gulf & Central Company, to wit: in the month of May, 1855, appointed certain delegates authorized to represent them, and to confer with other delegates appointed by the said Pensacola & Georgia Company, and to agree upon the terms on which your orators would consent to relinquish their rights or a portion of them, so as to enable the said Pensacola & Georgia Company to construct the road or a portion thereof, embraced in the notice to the trustees; that at a meeting of said delegates it was agreed that the mutual interest of both companies demand that said companies should act in unison and friendly concert, and that the work on said line be commenced simultaneously at Jacksonville and in Middle Florida; that the Central Railroad Company undertakes and pledges itself to construct the road from Jacksonville to a point at or in the vicinity of the town of Alligator in the county of Co-

lumbia, and the Pensacola & Georgia Railroad company to build the road west of said point, (at or in the vicinity of Alligator,) which shall be the point of connection of said roads; that the Pensacola & Georgia Railroad Company and the Florida, Atlantic & Gulf Central Railroad Company pledge themselves to each other, to make every effort to bring about a speedy accomplishment of the great enterprise in which they have embarked, and with this view they will exert their best energies to commence their respective undertakings at the earliest practicable moment, and will prosecute the work vigorously to its completion.

The bill further avers that the said agreement had reference to the construction of the entire Railroad to Pensacola; and that the pledge in said agreement to make every effort to bring about "a speedy accomplishment of the great enterprise" and "prosecute the work vigorously to its completion," was directly intended to apply to the entire Railroad to Pensacola, and that in consideration of the said pledge, and relying on the good faith and abundant pretended means of the said Pensacola & Georgia Company, they entered into the said agreement, and yielded up to the said Pensacola & Georgia Company their rights under the Internal Improvement act over so much of the road as lay west of Lake City, then called Alligator.

The bill further alleges that in pursuance with this agreement, the said Pensacola & Georgia Company applied for and procured the passage of the act of 26th November, 1855, as an amendment to their charter, (see Pamphlet Laws of 1855, page 15,) for power to build the road embraced in the aforesaid notice of acceptance.

The bill avers performance on the part of the appellants, and charges that in this agreement the said Pansacola & Georgia Company expressly postponed any connection with

the Georgia line until after the road to Pensacola was built; and further charges that the Pensacola & Georgia Company have as yet built no portion of the Railroad towards Pensacola, west of the town of Quincy.    That in violation of said agreement, the said Pensacola & Georgia Road are now constructing a Branch Road to the Georgia line from a point on their road at or near Houston, about seventeen miles west of the town of Alligator and east of the Alapaha and Suwannee rivers, with the intention, as they believe and charge, of never building the Road to Pensacola, but of making their Gulf terminus at a place called Gulf City, in Middle Florida, in which they are aided and abetted by the interest of Savannah and other points in Georgia, in direct breach, as well of the notice to the trustees of the Internal Improvement Fund, as of their contract with the appellants.

The bill further sets forth in substance, that by the 30th section of the Internal Improvement act, its benefits will be lost if the road to Pensacola is not completed within eight years; that the said eight years will expire on the 6th of January, A. D. 1863; that nothing but the utmost diligence and the strictest application of all their means on the part of the Pensacola & Georgia Company to the construction of the road to Pensacola can possibly secure the completion thereof within the time limited by the said act.    The bill alleges fears and belief that without the aid offered by the Internal Improvement act, the Pensacola & Georgia Company will never be able to construct said road to Pensacola.

The bill further avers that in consequence of such inability and the failure to complete the entire road to Pensacola, the investment of the said Florida Atlantic & Gulf Central Company, in the construction of a Railroad between Lake City and Jacksonville, is rendered comparatively valueless, and they are wholly and entirely deprived of the consideration for which they relinquished their chartered and legal

rights over the route to Pensacola to the said Pensacola & Georgia Company.

The bill further avers that the restriction in the 2d section of the act of 15th January, A. D. 1859, amending the charter of the Pensacola & Georgia Company, and authorizing the construction of this Branch Road to Georgia, was to prevent the construction of either of the said Branch Roads at such time and in such manner as would be injurious to the interest of any part of the Railroad system, and particularly under the circumstances, reserved the right of objection in the Florida Gulf & Atlantic Company, and dependent on their consent.

The bill here sets forth a copy of the 20th section of the Internal Improvement act, and avers that having complied with the provisions of said section, the Florida Gulf & Atlantic Company secured their road from intrusion within twenty-five miles, and it further avers that the road which the Pensacola & Georgia Company have undertaken to construct to the Georgia line does run laterally within twenty-five miles of their route to Lake City.

The bill distinctly avers that the construction of the said Branch Road has never received the consent of the Florida Gulf & Atlantic Company, and it further avers that said Branch Road would seriously injure and impair the business and profits of their road, and that they will thereby be deprived of the means to pay the debts and liabilities incurred in the construction of their road, and they charge that the construction of such Branch Road would be in palpable violation of the vested rights of all persons owning the securities of said corporations and of said company.

The bill then gives a history of the passage by the Legislature of the above cited amendments to the charter of the Pensacola & Georgia Railroad Company, and charges that notices of the application of said amendments respectively,

156 SUPREME COURT.

Fla., Atl'e & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

as required by the constitution of the State of Florida in such cases, were not given; that the constitutional majority of the members of both Houses did not vote for the passage of said bills; that the same were not read a second time and in accordance with the constitution ordered to be read a third time on the day following; that under the pretence of correcting clerical mistakes, the General Assembly were induced to re-enact a verbatim copy of one of the amendments which otherwise they would not have done.

And lastly, the bill charges that the said pretended amendments to the charter of the Pensacola & Georgia Company were granted, if at all, before that portion of the main line between the Suwannee river and the Florida Railroad was completed, and for that reason the General Assembly did not possess the power to grant said right.

The Pensacola & Georgia Company in their answer demur to the bill for want of equity, and under the provisions of the statute of this State insist that they may have the same benefit as if they had formally demurred, and proceeding to answer, admits that both companies were incorporated by the several acts in the bill for that purpose set forth, but denies that the Florida Gulf & Atlantic Company had the exclusive right of building its said road to Pensacola; avers that by the terms of the charter of the Pensacola & Georgia Company, they acquired the right to build a road from Pensacola or any other point or points on the waters of the Pensacola Bay, and running thence in an Eastwardly direction to the Western or Southern boundary line of the State of Georgia, to be determined by its Board of Directors; that in their acceptance of the provisions of the Internal Improvement Act, they specified as their line of road such part of the line in the 4th section of the Internal Improvement Act mentioned as was within their charter, to wit: the route lying between Pensacola or the waters of Pensacola

Bay, and the point of intersection with the Florida Railroad on the most direct practical line to Jacksonville, with a view to an extension afterwards to the Georgia line.

The answer denies that said notice was in effect an express or an implied abandonment of their right and their intention to build their road to the Georgia line.

The answer also denies that they, the Pensacola & Georgia Company, ever had any doubt of their right under their charter to build their road on the line mentioned as their route in their said notice to the trustees, and they also deny that they ever sought any relinquishment to enable them so to do.

The answer admits that in 1855 an amendment of their charter was obtained, which, by its terms, gave them the right to extend its line to Alligator, but avers that this amendment was obtained out of abundant caution and to meet objections that might be made by stockholders to an onward connection with the Florida Road.

The answer admits that certain delegates were appointed by the respondents to meet delegates appointed by the appellants at Alligator on the 9th May, 1855, and avers that this was done on the invitation of the appellants and for the purpose of conferring on the interest of the companies, and not to agree on terms on which appellants should consent to relinquish any of their rights. The answer further avers that nothing was surrendered by said Florida Gulf & Atlantic Company as a right enuring to the Pensacola & Georgia Company between said delegates.

The answer denies that any contract was made of the character indicated in the bill of complainants.

Here follow copies of or extracts from the minutes of the Board of Directors appointing said delegates and showing the action of said Board in reference thereto, which, with the similar minutes from the Board of Directors on the other

158          SUPREME COURT.

Fla., Atl'c & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

side, will be commented upon and set forth hereafter.

The answer admits that the respondents are building a road from a point near Houston to the Georgia line, through Hamilton county East of the Alapaha river, and claims that as the part of the said line of road indicated in the 4th section of the Internal Improvement Act between the Suwannee river and the Florida road was constructed, there exists no impediment to their constructing said road to the Georgia line, and avers that no consent of the Florida, Gulf Atlantic & Central Railroad Company was necessary either by the terms of the law or otherwise to the exercise of this right.

The answer also denies that this road to the Georgia line is a lateral road to the road of the appellants or to the road already built by the appellees to Lake City, and avers that it is almost at right angles with the same; that whilst the general direction of the main line road is East and West, the general direction of the road going to the Georgia line is North and South, and does not in the smallest particular interfere with the exclusive right of appellants within twenty-five miles as a lateral road.

The answer further says that the means with which the Pensacola & Georgia Company are constructing said road to the Georgia line, are mainly if not entirely derived from special subscriptions for that purpose by the people residing in Hamilton county in this State.

On the coming in of the answer motion was made in the Court below for the injunction prayed for. The chancellor refused to grant the injunction. From this decree appeal is taken to this Court.

It is contended by the Solicitor for the appellants, that the Florida, Gulf Atlantic & Central Railroad Company has a right by virtue of its vested rights and privity with the Pensacola & Georgia Company from agreement and from Inter-

nal Improvement Act, to obtain the injunction sought. This involves the inquiry,

First, Whether any vested rights derived under act of incorporation of the appellant, or under the Internal Improvement Act, are impaired by the attempt to construct the said road from Houston to Georgia line.

Second, If no vested rights or Legislative contract thus derived is interfered with, then whether there was an agreement between said companies such as is alleged in the bill of complaint, and if so, whether the State has authorized the building of said road from Houston to Georgia line, the same being contrary to or in conflict with the vested rights of said appellant, and

Thirdly, Whether the remedy now sought by the appellant in the form of an injunction is the proper mode of redress. In other words we take it that the whole equity of the bill depends upon the establishment of the fact that some vested right of the complainant's comes in conflict with the Legislative act authorizing the Pensacola & Georgia Company to construct a Branch Road from Houston to Georgia line, and that the complainants have sustained substantial damage or are likely to do so from the violation of the legal right. As both parties are incorporated companies, claiming to act under several acts of the Legislature, professing to have in part one common design and purpose, and claiming a common right to do almost the same thing under their respective charters, it involves an enquiry into their respective rights under their several charters, and also under the provisions of the Internal Improvement Act, of which latter both are the acceptors.

It appears that the original charter, which is an amended charter, but as is averred in the bill of complaint the one under which the Florida, Gulf Atlantic and Central Railroad Company exercises their rights, was approved the 8th

160                    SUPREME COURT.

Fla., Atl'c & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

January, A. D. 1853.   It also appears that the original char-
ter of the Pensacola & Georgia Railroad Company was ap-
proved the 7th day of January, A. D. 1853.

Both acts of incorporation were passed at the same session
of the Legislature, and both develop the main intention of
the Legislature.   The question here presents itself whether
as the one act of incorporation received the approval of the
Governor one day before the other, this fact gives a prior
right.   The rule of law in such cases is, that acts passed at
the same session of the Legislature are to be taken *in pari
materia*, and to receive a construction that will give effect
to each if possible; but if each of them cannot have the same
entire effect when taken in connection with the other, that
it would if taken singly, they must be so construed as to give
effect to what appears to have been the main intention of
the Legislature.   The State vs. Rackley, 2 Blackford, 249.

We see no difficulty in giving effect to each of these acts.
Upon examination of them we cannot find that either cor-
poration had any express grant of an *exclusive* privilege of
building their respective roads.   The Fla., Atlantic & Gulf
Co. were authorized to construct a road commencing in
East Florida upon some tributary of the Atlantic Ocean
within the limits of the State of Florida, which commence-
ment might be at Jacksonville if thought best, and run
through the State of Florida in the most eligible direction
to some point, bay, arm or tributary of the Gulf of Mexico,
West of the Apalachicola river, in West Florida, having a
sufficient outlet for sea steamers, which might be Pensacola
or the waters of Pensacola Bay, as thought best, &c.   Here,
then, this company had the right of constructing a road on
the entire line mentioned in the 4th section of the Internal
Improvement Act, to wit: a line of Railroad from the St.
Johns river at Jacksonville and the waters of Pensacola
Bay.

The Pensacola & Georgia Railroad Company were authorized to construct a road from the city of Pensacola or any other point or points on the waters of the Pensacola Bay in Florida, and running thence in an Eastwardly direction to the Western or Southern boundary line of the State of Georgia. It will be seen that one of these roads was intended to commence West and run East, and the other to commence in the East and run West.

To determine how much of these several roads covered the same route will depend upon the construction to be given to the route expressed in the act incorporating the Pensacola & Georgia Company.

It is with much earnestness contended on the part of the appellant that a line in an Eastwardly direction to the Western or Southern boundary line of the State of Georgia, limited and restricted the Pensacola & Georgia Company from crossing the Apalachicola river going East, and therefore compelled them to go to the Georgia line at a point near the Apalachicola river, which would leave the balance of the route entirely with the Florida, Gulf & Atlantic Central Co., giving a common right to both companies from that point to Pensacola.

Here, we think, is the fundamental error of construction which has given rise to all the misunderstanding in this respect between these two companies. This question was fully up before this Court in the case of Johnson vs. P. & Ga. R. R. Co., and in construing this provision of the charter, the Court say : " For it is manifest from the plain and unequivocal language employed in the third section of the original charter that the Legislature intended to confer upon the Board of Directors an unrestricted power to fix the terminus of said road, after leaving Pensacola Bay and running thence Eastwardly, any where and at any point on the boundary

line between the States of Florida and Georgia ; " and in the same case it was held that the town of Alligator, now known as Lake City, was on a line Eastwardly from Pensacola Bay to the boundary line between the States of Florida and Georgia. We geographically know that under this construction of that charter, the utmost point of departure from the route to Jacksonville eastwardly to said boundary line must be somewhere in the vicinity of the junction with the Florida Road, at the town of Baldwin. Therefore from that point, anywhere to a point near the Apalachicola river, would be an eastwardly direction from Pensacola.

It follows then from this, that the route of the Pensacola & Georgia Company, under the original charter, was or might be over the same route as that of the Florida, Gulf Atlantic & Central Co., excepting only that portion of the latter road from a point near Baldwin to Jacksonville, and was on the line specified in the 4th section of the Internal Improvement Act, excepting that portion from a point near Baldwin to Jacksonville. Thus both companies had a common right over so much of said route as is above specified, neither corporation having an exclusive right to build said road, nor any pledge from the State that no other road should be constructed running laterally with the route. The main intention of the Legislature in chartering these companies appears from their respective charters to be, the securing the construction of a railroad running through the State from Jacksonville to Pensacola, and some point anywhere on the boundary line of Georgia eastwardly from Pensacola.

So far as we have above specified, the said two corporations were on equal footing. The only way that either corporation could have secured a vested right of construction, as against the other, was by first occupying the same, (i. e.) the right of occupancy over any portion of said route that they might first, occupy with an honest and faithful intention of constructing,

coupled with the ability so to do. We do not wish to be understood as holding that these companies might then have selected detached parts of said road and held it by right of occupancy so as to block up the way of the other; but we do hold that they might have commenced at a point and built until they formed a junction with each other, or each one might have built an entire line, so that there might have been two roads from Baldwin to Pensacola.

This was the situation of these two corporations when the Internal Improvement Act of 1855 was passed. This last mentioned act held out to these two corporations who were contemplating a construction of this road, but who were rivals in a large portion thereof, if they would accept of it, the aid of the State; and not only that, but what they had not before, to wit: a security from the State that no other latteral road should ever be constructed within twenty-five miles of said route, as well as other pledges and benefits which neither corporation had at that time. On the part of the State of Florida it was declared in the 4th section of said last mentioned act what the line of road the State would aid should be, to wit: a line of railroad from the St. Johns river at Jacksonville, and the waters of Pensacola Bay, &c. The railroads accepting the provisions of this act were required to give notice of their acceptance and specify the part of the route they propose to construct. The other provisions of that act applicable to the point in issue before the Court will be noticed hereafter.

Under this provision, the Pensacola & Georgia Railroad Company file their acceptance and specify the part of the route they propose to construct, which was " the route lying between Pensacola or the waters of Pensacola Bay and the point of intersection with the Florida Railroad, on the most direct practicable line to Jacksonville, with a view to an extension afterwards to the Georgia line."

164 SUPREME COURT.

Fla., Atl'c & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

The Florida Gulf, Atlantic and Central Company file their acceptance and specify the part of the route they propose to construct, which was "the entire line of road embraced in their said charter and the amendments thereto as required by said Internal Improvement act."

At this stage of the history of these roads, the bill of complaint sets up the appointment of delegates between the said companies and the action of their Board of Directors, &c., all of which are alleged to be an agreement, or contract between them, the obligations of which they charge have been impaired by subsequent legislation of the State and action of the appellees, which we will notice when we arrive at that portion of our duty, our object being in this place to continue our inquiry as to whether there has been any *legislative* contract, the obligations of which are impaired.

It is urged on the part of the appellants that the amendment to the charter of the Pensacola & Georgia Railroad Company, passed 15th December, 1855—(see Pamphlet Laws of 1855, page 15,) gives a legislative construction of the route designated in the original charter of that company, such as is contended for by the appellant, and authorizes them to build an *extension* of their road to a junction with the Florida, Atlantic & Gulf Central Railroad, at or in the vicinity of Alligator, and it is contended that it was this amendment that gave *that* company the power to construct the road from a point near the Apalachicola river to said Alligator.

Were this amendment act standing solitary and alone, the argument would be a sound one, but as we have already decided, the original charter gave this same right of construction to the Pensacola & Georgia Company, consequently the amendment in the 1st section of the act is nothing in that respect but a re-enactment of the original charter, un-

less some agreement between the two corporations gives it a different construction.

It appears from the bill, and is admitted in the answer, that these two corporations proceeded to build their line of road, the one company commencing at Tallahassee and building down eastwardly to Alligator; the other company commencing at Jacksonville and constructing westwardly on their route to Alligator, there forming a junction with the two roads, and making complete the construction of that part of the line between the Suwannee river and the Florida Railroad.

This brings us now to consider the constitutionality of the act passed 15th January, 1859, and re-enacted 22d December, 1859, which amended the act incorporating the Pensacola & Georgia Railroad Company, and empowered them to build a road from their main line to the Georgia line, east of the Alapaha river.

It is contended, with great ability, by the Solicitor for the appellant that the authority here given to build this branch road was, and is in violation of the 24th section of the Internal Improvement Act.

Secondly, That it is a lateral road and in violation of the 20th section of said act, and

Thirdly, In violation of an agreement made between the said companies, that the said Pensacola & Georgia Company should not build any branch road to Georgia until the whole line of road to Pensacola should be completed, without the assent of appellant.

Lastly, That it was unconstitutionally passed, &c.

There is no evidence in the record to show that this road from Houston to the Georgia line runs laterally with the main line. It is true the bill so alleges, but the answer directly responsive to the bill positively denies it, and avers that it is almost at right angles with the same, and that the

general direction is north. It will be remembered that this cause comes before the Court on bill, answer and exhibits. We, therefore, cannot declare the law in violation of the 20th section of the Internal Improvement Act.

It is enacted in the 24th section of the Internal Improvement Act, "That no branch roads from the main line of Railroad provided for by this act between the waters of Pensacola or Escambia Bay, and the junction with the Florida Road, shall be made to the northern boundary line of the State, until that part of the line between the Suwannee river and the Florida Railroad has been constructed."

The record shows that that part of the line between the Suwannee river and the Florida Railroad has been constructed.

It is insisted by appellant that the line is one entire line, and that the Legislature meant here the construction of the whole line from Pensacola before a branch road can be thus made.

This is a question important and involves the franchise of the State. It becomes important to inquire upon what principles the State parts with or grants corporate franchise. It is also a matter where the public interest is concerned.

If it be true that the Legislature restricted the building of a branch road east of the Alapaha, until the entire line from Pensacola to a junction with the Florida Road should be built, then the State has taken from the public their power of improvement and public accommodation, and surrendered it to these corporations until the whole line is constructed, which may or may not be completed.

Before proceeding to construe this 24th section, it becomes important to lay down the rule of interpretation, that is to say whether the grant of these companies in their entire franchise is subject to the rules of interpretation applicable to ordinary statutes, grants or contracts, or whether the true

rule of legal interpretation is a much more enlarged one in favor of the public.

Upon the authority of undoubted judicial precedents we conceive the rule to be that a mere ambiguity in the charter of such corporation is *alone*, in any case, sufficient to determine its meaning against the corporation and in favor of the public.

Chief Justice Best, (4 Bingham, 452,) has given a reason for it that " if such a construction were not adopted, acts would be framed ambiguously in order to lull parties into security."

In our own country the following language is used, viz :

" In charters of this description, no rights are taken from the public, or given to the corporation beyond those which the words of the charter, by their natural and proper construction, purport to convey.  *  *  *  The whole community are interested in this inquiry, and they have a right to require that the power of promoting their comfort and convenience, and of advancing the public prosperity, by providing safe, convenient and cheap ways for the purposes of travel, shall not be construed to have been surrendered or diminished by the State, unless it shall appear, by plain words, that it was intended to be done." See Charles River Bridge vs. Warren Bridge, 11 Peters, 550.

In support of this proposition a great many decisions in England and in this country might be cited ; but the Stourbridge Canal case, 2 Barnewall & Adolphus, 793, in the King's Bench in England, and of the Charles River Bridge in the Supreme Court of the United States, are sufficient.

Were an ambiguity in this section admitted, under the above rule of construction the provisions thereof must be interpreted in favor of the public, which undoubtedly would be to sustain the Legislature in their extension of power to build the Branch Road.

The provisions of this section, taken in connection with the general object of the Internal Improvement Act, and the whole scope thereof, are to our minds by no means ambiguous.

The only difficulty in the construction of this section arises from the expression "that no Branch Roads from the main line of Railroad, provided for by this act," &c.

From this it is contended that the Legislature meant that the entire line should have been first built, and that the initial point was Pensacola; but there follows the words, "until that part of the line between the Suwannee river and the Florida Railroad has been constructed." Now, what did the Legislature mean by using the words "until that part of the line"? It will be seen by the 5th section of the act that the building of this road in portions under different charters and amendments thereto, was contemplated. Thus they say "*until that part of the line* between the Suwannee River and the Florida Railroad has been constructed."

In the argument of this case it was urged by the learned Solicitor for the appellees, that this road from Houston to the Georgia line was an extension of the main line to Georgia as authorized by the original charter.

This might be so, had they not accepted the Internal Improvement Act, and under it made their point of departure to the Georgia line at Lake City. This they assumed in the Johnson case, and the fact that Lake City was on a line to the Southern boundary line of the State of Georgia in an eastwardly direction from Pensacola, and the point of *extension* was from there, decided that case.

It is difficult, under this state of facts, to see how the Pensacola & Georgia Road could have an extension at Houston without abandoning the one at Lake City, and there is no evidence that that has been done. What is the extension of

a road? The word extension in that sense means *continuation of length.*

The line of this road is in an eastwardly direction, running east and west. The appellees, in their answer, say the road from Houston to Georgia line runs north. Would it not be a little repugnant to the idea of this main line, by saying it has been *extended* by a right angle road? Would that be a continuation of length? We think not.

There can be no doubt the road in question is a branch road, and we see no legislative contract with said Florida, Gulf, Atlantic & Central Road Co., that was violated, altered or impaired by the Legislature authorizing the building of this branch road. Nor do we find any provision in the act of 22d December, 1859, or any of the acts, which required the *assent* of said Florida, Gulf, Atlantic & Central Company to the building of said road.

Finding no *legislative* contract the obligations of which have been impaired by the passage of the act authorizing the construction of said branch road, we might, were it not contended that a private agreement between these two companies had received the confirmation of the Legislature giving them a vested right which is in conflict with the act authorizing the construction of said branch road, and therefore unconstitutional, dismiss consideration of the remaining branches of the case. Were the authority to build a branch road at the point named given by the Legislature to any other corporation, but one or the other of said corporations, all the private contracts they could have made in the world would have been of no avail against an act of the Legislature authorizing it, for in such case we take it that the spirit of the language of a learned Judge of the King's Bench would be peculiarly applicable, viz: "Numerous applications are made to Parliament by speculative individuals to

22

170                   SUPREME COURT.

Fla., Atl'c & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

form these navigable canals and railways ; great public ben-
efits are held out as an inducement to the Legislature to
sanction these undertakings, and when their sanction is ob-
tained, is it to be permitted to these persons to say that they
will do only that which is *beneficial to themselves*, and disre-
gard entirely the interests of the public ?"

But it is set forth in the bill and averred, that delegates
were appointed to confer from said corporations, and that
they did meet and confer, and that it was mutually agreed,
in an agreement solemn in its character, which was sub-
sequently, with the assent of the State by its act of the
Legislature in the amendment of the acts of incorporation
of these respective companies, ratified and confirmed, and
therefore binding upon the sovereignty of the State, so as
to prohibit constitutionally the authority to said company to
build said branch road, said authority having been given
in conflict with their vested rights, and that injunction is
the proper remedy to restrain the building thereof thus au-
thorized by the State.

If this position is sustained by the facts, it seems well set-
tled law that it is the right of an individual or corporation
having vested rights to enjoin another corporation where the
damage about to be done is of a *permanent* and irreparable
character, and especially when the defendants seek to do it
under color of a charter.    1 American Railway Cases,
278; Gardner vs. Newburgh, 2 John. Ch. 162; Newburgh
Turnpike Co. vs. Miller, 5 John. Ch. 101.

We are now to see if such an agreement was made be-
tween said parties and the State, as set forth or claimed in
the 'bill of complaint.   The premises of this contract are
alleged to be embraced in the following minutes and pro-
ceedings of the respective Boards of said companies, and the
extracts from the Reports of Messrs. Cabell and Sanderson,
Presidents of said companies, respectively, viz :

"At a meeting of the 'Board of Directors of the Pen. & Ga. Railroad Co.,' May 9th, 1855 :—

"The Secretary, Col. B. F. Whitner, read a communication from the Florida, Atlantic & Gulf Central Railroad Co. ; also the proceedings of that company at a meeting of their Directors on the first inst., announcing the appointment by them of a committee, to be raised by this company to meet at Alligator on the 24th instant, to confer on the interest of the company, and therefore it was

"*Resolved*, To accept this invitation, and Messrs. J. C. McGehee, B. C. Pope, E. C. Cabell and Edward Bradford, were appointed a committee on behalf of this company, with authority to substitute another stockholder as a member in place of any one who shall be unable to attend."

[Extract of the proceedings of the Delegates.]

"After some preliminary discussion it was deemed advisable, considering the great length of line of road connecting the waters of the Atlantic with the waters of Pensacola Bay, that the work should be undertaken by different organizations; whereupon it was unanimously resolved that the mutual interests of the Florida, Atlantic & Gulf Central Railroad Company and of the Pensacola & Georgia Railroad Company demand that the said Companies should act in unison and friendly concert, and the works on said line of road be commenced simultaneously at Jacksonville and Middle Florida. That the Central Railroad Co. undertakes and pledges itself to construct the road from Jacksonville to a point at or in the vicinity of the town of Alligator, in the county of Columbia, and the Pensacola & Georgia Company to build the road West of said point (at or in the vicinity of Alligator) which shall be the point of connection of said roads.

"The following resolutions were also unanimously adopted :

"*Resolved*, That the Pensacola & Georgia Railroad Company, and the Florida, Atlantic and Gulf Central Railroad Company, pledge themselves to each other to make every effort to bring about a speedy accomplishment of the great enterprise into which they have embarked, and with this view they will exert their best energies to commence their respective undertakings at the earliest practicable moment, and will prosecute the work vigorously to its completion.

"*Resolved*, That the people of Florida have the ability— if they have the will—to construct and complete the entire line of road at no distant day, and that every friend of internal improvement and every true Floridian be earnestly urged to give a small portion of his time, influence and money to the completion of our enterprise, fraught with such countless blessings to our State and people,"

"At a meeting of the Board of Directors, June 30, 1855, Judge McGehee, on behalf of the committee consisting of Messrs. McGhee, Cabell and Pope, appointed to meet a delegation from the Florida, Central Gulf & Atlantic Railroad Company at Alligator, made a report which elicited considerable discussion. Without any action on the subject matter of the report, it was on motion *ordered* that said report be referred to a committee consisting of Messrs. Archer, Whitner and Gamble.

"At a meeting of the Board, October 18th, 1855, Mr. Archer, from the committee to whom was referred the report of the delegation to Alligator in May last, made a report accompanied by the following specifications and terms recommended as proper to be adopted for the protection of the interest of this Company:

"First. The Pen. & Ga. Railroad Co., if they be compelled to seek a terminus on the Georgia line east of the point now contemplated in Hamilton county, may use any part of the road of the Atlantic & Gulf Cent. Co., as part of the road of

TERMS HELD IN 1862. 173

Fla., Atl'c & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

the Pen. & Ga. Company to the Georgia line, and in like manner the Atlantic & Gulf Cent. Co. may use any part of the road of the Pen. & Ga. Railroad Co. which may intervene by the Atlantic & Gulf Central Railroad Company.

"Second. The Pen. & Ga. Railroad Co. shall exercise the same rights, and especially in reference to the branches to the northern boundary line of this State in Middle and West Florida, as if that company had constructed the road from the Suwannee to the junction with the Florida Railroad.

"Third. If when the Pa. & Georgia Railroad Co. shall have constructed their road to Alligator, the other company shall not have constructed theirs to that point, the former company shall be at liberty to construct eastward to the Florida Road, or to a junction with the road from Jacksonville west, and in the latter event the connection at the point of meeting shall be made on the same terms as provided for a connection at Alligator, and if any part of the work from Alligator eastward shall have been performed, the Pensacola & Georgia Railroad Company may adopt that work as part of their road, they paying therefor the stock of their company to the amount of the cost of the work, and the Atlantic & Gulf Central Railroad Co., if the other company do not construct their road to Alligator by the time the Atlantic & Gulf Central Railroad Co. shall have constructed theirs to that point, to be at liberty to construct westwardly, until they connect with the road of the Pen. & Ga. Railroad Co., and a connection at such point of meeting shall be established on the same terms as provided for a connection at or near Alligator.

"Fourth. So far as either company shall build any part of the main line of road from Jacksonville to Pensacola Bay, such company shall have, in addition to the privileges secured to them by its charter, all the privileges secured by the charter of the other company, and especially in respect

174 SUPREME COURT.

Fla., Atl'c & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

to branch roads or connections : Provided, that the main line of the Pen. & Ga. Railroad Co. to the Georgia line, shall not be deemed a branch road or connection within the meaning of this clause.

" Fifth. Passengers, freights and cars of each company shall pass over each road with the same facilities as if the whole road had been constructed by one company, and passengers, freight and cars on the road to the Georgia line coming south to the main line from Jacksonville to Pensacola Bay, whether going east or west, after reaching said main line, or passengers, freight and cars passing from any point on the main line from Jacksonville to Pensacola Bay, and going up the road to the Georgia line, shall pass with the same facility as if they shall continue on the main line.

" Sixth. All passengers and freight passing over the roads or portion of the roads constructed by each company shall be charged a uniform rate of fare and freight, to be equitably established with reference to the cost of construction of the roads over which such passengers or freight may pass, and in such manner as that the counties and other subscribers may receive dividends from through freight, &c., upon the basis of the capital invested, rather than upon the estimate of distances.

" Seventh. The two companies shall unite in asking the General Assembly to ratify and confirm the agreements which shall be made between them by proper amendments to their respective charters in such manner as to give effect to their agreement."

After some discussion the report and all the foregoing specifications, except the *sixth*, (6) were adopted, and it was ordered that a copy of the report and specifications, and the action of this Board thereon, be communicated to the Fla. & Atlantic & Gulf Central Railroad Company by the President of this company.

Let us turn now to the act of amendment passed 22d December, 1855. We find in the first section of that act, that the Pensacola & Georgia Company are authorized to extend their road to a junction with the Central road at Alligator, and to carry it on further to a junction or to the Florida road.

In the 2d section they declare where they may commence their work, to-wit: at any one or more points on the main line—it also authorizes them to assign any portion of their main line, and invests assignees with franchise—and in the 3d section specifies what extensions and branches shall be entitled to benefits under the 29th section of the Internal Improvement Act, and in the last section authorizes that Company to purchase the Tallahassee Railroad, stock, &c.

Corporations like these are authorized to act through their Board of Directors, and many contracts are made by mutual resolutions agreeing to some particular thing within the scope of the authority of the Directors.

There is no evidence in the record that the Florida, Gulf, Atlantic & Central Company ever accepted the above propositions of the 18th of October, 1855. It is contended in argument that they must have done so because the amendment to the Pen. & Ga. Railroad Company charter reflects the spirit of them. Under this view of it, it is contended that the authorizing of the extension of the main line from a point near the Apalachicola River to Lake City, and a point of conection beyond that, is the evidence of the surrender of franchise by the Florida, Gulf, Atlantic & Central Company—that it might be granted as it was granted, to the Pensacola & Georgia Company, and therefore confirmation by the Legislature of the agreement. Here we think is another mistake into which the Appellants have fallen. That amended act imparted no new franchise to the Pensacola & Georgia Company, as we have already seen they had this right of

176                    SUPREME COURT.

Fla., Atl'c & Gulf Cent. R. R. Co. vs. Pen. & Ga. R. R. Co.—Opinion of Court.

construction before.    Therefore the evidence is not sufficient. We have carefully examined all the said proceedings of the respective Board of Directors, and the act of the Legislature, which is claimed ratified their agreement, and although the act does embrace some of the articles mentioned in the report of Messrs. Archer and others, as a committee of the Directors of the Pensacola & Georgia Company, yet there is no agreement, or words that we can construe into an agreement, wherein these Companies agreed one with the other that no branch road should be built to the Georgia line, until the whole line of road is built from Pensacola to Jacksonville.

We think the Appellant errs in assuming that they by said proceedings or by the provisions of said act confirming the same, surrendered any portion of their franchise or their right of construction of that part of the main line from Alligator to the Apalachicola River.

If they surrendered any right at all, it was irrespective of this act of the Legislature, and was by permitting the Pensacola & Georgia Company to first occupy that part of said line.    We are of the opinion that the utmost effect that can be given to these proceedings through said delegates was a mutual adjustment and arrangement of their rights and aims, so that they might act in unison and friendly concert, and a pledge to make every effort to bring about a speedy accomplishment of the great enterprise into which they have embarked.    For this purpose they were to commence simultaneously, the one at Tallahassee and the other at Jacksonville.

If the progress of the construction of the main line towards Pensacola is not with that rapidity and good faith expected, we see no reason why the Florida, Atlantic & Gulf Central Railroad Company may not take the work into their own hands.    They are not divested of any authority to construct the road they ever had, and there does not appear to us any

impediment to their commencing at the Apalachicola River and constructing the line to Pensacola.

The Pensacola & Georgia Railroad Company in response to the bill deny that they have or ever had any intention of abandoning the construction of said entire line to Pensacola, on the contrary aver that they still expect and hope to be able to build the same.

In answer to this it is argued that ALL the means of the Pensacola & Georgia Company are necessary to the completion of the road to Pensacola, and that speedy construction is necessary because the time for construction is limited by the Internal Improvement Act.

Upon referring to the 30th section of the Internal Improvement Act, it provides " that *no bonds* shall be issued to the Companies under the provisions of this act, in aid of any part of their Roads not completed at the end of eight years from the passage of this act."

While they may after the expiration of eight years be cut off from receiving bonds in aid, it by no means follows that for this reason the Companies may not be able to build the road. They have still the lands and individual enterprize to rely upon, which for all that appears of record may be abundant. If, however, the Florida, Gulf, Atlantic & Central Railroad Company think the Pensacola & Georgia Company are not acting in good faith and do not intend to carry out their pretensions, or have not in fact the means of doing the work, then they have but to enter upon the construction themselves, and should the right of prior occupancy be urged, and efforts made through a Court of Chancery to restrain them, they having under their original charter and specification under the Internal Improvement Act a common privilege of construction, have but to show to the Chancellor the bad faith of the Pensacola & Georgia Company, or their

want of means to construct, in response.    Upon which show-
ing, no Court will have a right to enjoin them ; on the con-
trary the interests of the public make it their duty to pro-
ceed in this great public enterprise.

While our Courts will sacredly guard the rights of private
property, they will not forget that the community also have
rights, and that the happiness and well being of every citi-
zen depends on their faithful preservation.

It is urged by the Appellant that the act of 1859 author-
izing the Appellees to build a branch road from Houston to
the Georgia line, was passed by the Legislature contrary to
the forms and the requirements of the Constitution, and
therefore void and of no effect.    The Appellee in reply con-
tends that the question of notice and mode of passing an act
is to be determined by the Legislature, and the Court cannot
enquire into it.

Under the view which we have taken of this case, the ex-
amination of and passing upon this important question is un-
necessary.    Whether this court can or cannot in any case in-
quire whether the forms and requirements of the Constitu-
tion have been complied with or not in the passage of an act
of incorporation, we do not now undertake to say.    It is clear,
however, in this case, that as the Appellant has not shown
a vested right which is in conflict with the law of incorpora-
tion thus alleged to have been passed, we are not called up-
on to go into that question.

The opinion of the Court is that the decree of the Chan-
cellor in the Circuit Court refusing the prayer of the Bill for
an injunction in this case be affirmed with costs.