THE STATE EX REL. H. W. ARPEN, RELATOR, VS. MOSES J.
BROWN, COLLECTOR OF REVENUE FOR DUVAL COUNTY, RE-
SPONDENT.

1. The act of March 3, 1883, relating to granting licenses for the sale
of intoxicating liquors, so far as it requires that an applicant for
a license shall produce to the Board of County Commissioners
an application signed by a majority of the registered voters in
the election district in which he desires the privilege to sell, and
otherwise comply with the terms prescribed, is a valid act, not
repugnant to the Constitution of this State or of the United
States.

2. The fifth and sixth sections of the act, which seek to invest the
Board of County Commissioners with judicial power to hear,
try and determine a complaint against the holder of a license,
and to impose a penalty by revoking the license, are void, as they
create a court not authorized by the Constitution.

3. An act may be void in part without affecting other parts of it, if
that which remains is capable of being executed in accordance
with the purposes of the Legislature wholly independent of that
which is rejected.

37

The alternative writ makes no allegation of a compliance with the requirements of Chapter 3416, Laws of Florida, approved March 3, 1883.

Sections 1, 2, 3, 5 and 6 of said act are as follows :

Sec. 1. That from and after the passage of this act it shall not be lawful for any person or persons, firm or firms, to sell any intoxicating liquors, wines or beer, in any election district in any county in this State, except as hereinafter provided.

Sec. 2. Any person or persons, firm or firms, wishing to sell liquors, wines or beer, shall make application to the Board of County Commissioners of the county in which the privilege of such sale is desired, at a regular meeting of said Board, for a license to sell such liquors, wines or beer, said application to be signed by a majority of the registered voters in such election district, as shown by the registration list on file in the office of the Clerk of the Circuit Court at the date of such application, asking said Board to grant to said applicant the right to sell such liquors, wines or beer ; and the said applicant shall be required to make affidavit that each and every name or mark affixed to such petition was the act and deed of the party purporting to have signed the same, which said signing shall be in the presence of at least two credible witnesses, and that there was no fraud, bribery or deception in procuring said signatures or marks to such petition ; and said petition, with the names and marks thereto attached, shall be published in full, at the expense of the petitioner, in a paper published in said county, and if there is no paper published in said county, then a copy of said petition and signatures shall be posted at the county site and at the election precinct of the district wherein such license is sought, for the space of two weeks before the County Commissioners meet to hear such petition.

Sec. 3. No Collector of Revenue of any county shall issue license to any person or persons, firm or firms, unless a permit is presented from the Board of County Commissioners ; and such license, so issued, shall contain a provision that the same may be suspended or revoked by the Board of County Commissioners for any of the causes hereinafter set forth.

Sec. 5. The County Commissioners shall have the right, and shall exercise the same, to suspend, at any time, the license of any dealer in liquors, wines or beer in their respective counties upon the affidavit of two or more reliable citizens that such dealer has sold any intoxicating beverage to any minor or any person in a state of intoxication.

Sec. 6. Such affidavit shall be made before the Clerk of the Circuit Court, and the said Clerk shall notify the dealer, by written notice, served by a constable or sheriff, requiring said dealer to appear before the Board of County Commissioners at its regular meeting next thereafter ; and the Board shall take the proof, hear and determine whether there has been such violation as has been complained of, and if the charge is sustained revoke said license.

Section 1 of Article 6 of the State Constitution is as follows :

Sec. 1. The judicial power of the State shall be vested in a Supreme Court, Circuit Courts, County Courts and Justices of the Peace.

Section 16 of same article authorizes the Legislature to establish courts for *municipal purposes only* in incorporated cities and towns.

And Section 18 of the same Article is as follows :

Sec. 18. No other courts than those herein specified shall be organized in this State.

The defendant moved to quash the writ.

The other facts are sufficiently stated in the opinion.

*Wm. B. Young* for the Motion.

The relator must have a clear legal right to have the act done, to compel the doing of which the writ is sought. Wood on Mandamus, 68.

A statute of the State prohibits the respondent from doing the act which the relator seeks to compel him to do, and its constitutionality cannot be tested in a proceeding by mandamus against the Collector. Hall vs. Supervisors, 20 Cal., 591.

The Constitution of the State is not a grant of power, nor is it an enabling act to the Legislature. It is a limitation upon the general powers of a legislative character, and restrains the Legislature only so far as the restriction appears, either by express terms or necessary implication. Bourland vs. Hildreth, 26 Cal., 161 ; Smith vs. Judge, &c., 17 Cal., 547, and 17 Cal., 23.

Before any act of the Legislature can be declared void the court must be able to say that some specific provision of the Constitution has been violated, and the violation must be clear and entirely free from doubt. Cheney and Wife vs. Jones, 14 Fla., 587 ; State *ex rel.* Atty.-Gen. vs. Knowles, 16 Fla., 615.

Section 18 of Article IV of the Constitution is the only possible section that it can be claimed prohibits the Legislature from the passage of this act. That provides that in all cases where a general law can be made applicable all laws shall be general and of uniform operation. That the act called in question is general and applies to every person and portion of the State, cannot be denied. Is it of " uniform operation throughout the State ?" The word uniform in said section does not mean universal, and that section intends simply that *the effect* of laws of a general nature shall be the same to and upon all persons who stand

in the same relation to the law; that is, all the facts of whose cases are substantially the same. The statute must be general and uniform in its operation upon all persons in the like situation. Smith vs. Judge, &c., 17 Cal., 547; 20 Iowa, 342; (the last case cited with approval in McConihe, Mayor, vs. *ex rel.* McMurray, 17 Fla., 238;) 42 Ind., 547.

That the Legislature has the power to license, restrain and regulate occupations, and impose conditions to be complied with before the license can be issued, unless prohibited by the Constitution, is settled by a long list of authorities. Dorman vs. State, 34 Ala., 216, and authorities there cited; Mayor, &c., vs. Yuille, 3 Ala., 137; in the matter of J. L. Dorsey, 7 Porter, 361; Lodano vs. State, 25 Ala., 64; 21 Am. Repts., 765.

That the Constitution of Florida contemplates the exercise of this power instead of prohibiting it, is apparent from Section 6 of Article 12.

A license issued in pursuance of law, and authorizing any person to exercise privileges that he could not lawfully exercise without it, is a franchise. *Ex rel.* Atty.-Gen. vs. Jones, 16 Fla., 306.

Chapter 3296, Acts 1881, requires every person who wishes to practice medicine or surgery to get a permit from a board appointed by the Governor. Will it be pretended that this provision of law is not general and of uniform operation because numerous citizens could not pass the examination and get the permit from the board? So with pilots.

These occupations are useful and beneficial to the community. Will any man say that the sale of vinous or spirituous liquors is beneficial or useful to the community? Why may the Legislature not require as a condition, as a qualification, for obtaining permission to deal in an article which tends to promote pauperism and crime, that the person

shall have the confidence of a majority of the registered voters of the community, proof of such confidence to be made in the manner pointed out in the statute? The law makes no exception in favor of any individual or class. Its effect is the same upon all persons who stand in the same relation to the law.

Laws restraining the sale of liquor have been repeatedly sustained, when the question of conflict with State Constitutions has been raised, upon the ground that they are police regulations, established by the Legislature for the prevention of pauperism and crime. It has also been held that the sale of liquor may be declared a nuisance, and the liquor and buildings in which it is sold condemned by legal process. Cooley on Const. Lim., marginal page 583, and authorities cited in note.

The revenue act, approved March 5th, 1883, does not repeal this act. Acts passed at the same session of the Legislature are to be taken in *pari materia* and receive a construction that will give effect to each if possible. Fla. A. & G. C. R. R. vs. P. G. R. R., 10 Fla., 145.

There is no conflict between these acts. The statute now under consideration is intended to prescribe conditions upon which persons may obtain a license, and the revenue act was intended to impose a tax upon the license when obtained, and imposes an additional requisite.

This act is not a delegation of legislative power, and violates no provision of the Constitution. State vs. Court of Common Pleas, 36 N. J., Law 72; Locke's Appeal, 72 Pa. St., 491, (13 Am. Repts;) Groest vs. State, 42 Ind., 547 ; Cent. Law Journal, Vol. 12, No. 6, p. 123, *et seq.*

*John Earle Hartridge* for Relator.

The power to make law is conferred by the Constitution on the Legislature, and cannot be delegated by the Legis-

lature to the people of the State or any portion of the people. Ex-parte Wall., 48 Cal., 279 ; Houghton vs. Austin, 47. Cal., 646 ; Barts vs. Himrod, 8 N. Y., 483 ; Bank of Rome vs. Village of Rome, 18 N. Y., 38; Steerin vs. Town of Genou, 23 N. Y., 439 ; Clark vs. City of Rochester, 28 N. Y., 605 ; Thorn vs. Cramer, 15 Barb., 112 ; Bradley vs. Baxter, 15 Barb., 123 ; Parker vs. Commonwealth, 6 Penn. St., 507 ; Commonwealth vs. Quarter Sessions, 8 Penn., 391 ; Locke's Appeal, 72 Penn., 491 ; State vs. Wilcox, 45 Mo., 459 ; Rich vs. Foster, 4 Har., (N. J.) 479 ; State vs. Copeland, 3 R. I., 33 ; Railroad Company vs. Commissioners of Cleotine County, 1 Ohio, (N. S.) 77 ; People vs. Collins, 3 Mich., 343 ; Tanta vs. State, 2 Iowa, (Clark's) 165 ; Geilrick vs. State, 5 Iowa, 491 ; State vs. Beinke, 9 Iowa, 203 ; State vs. Weir, 33 Iowa, 134 ; Minge vs. State, 4 Ind., 343 ; Meshmeier vs. State, 11 Ind., 482 ; State vs. Swisher, 17 Tex., 441 ; State vs. Parker, 26 Vermont, 357 ; Acker vs. State, 5 Ind., 193 ; Greencastle Township vs. Black, 5 Ind., 557.

In all the above cases representing numerous and different States the diction is promulgated that a law must be complete in itself when it leaves the hands of the law-making power. The Legislature having been selected by the people for their wisdom, experience and fitness to make the laws for the State cannot delegate power to the people or any portion of the people. This principle is not denied. This being true as a matter of law the natural inquiry arises is this law complete in itself, or does it depend upon a vote of a portion of the people to give it life ?

It is true that the taking effect of a statute may sometimes be made to depend upon a subsequent event. But in all of those instances the Legislature determine for themselves the expediency of the law. They do not leave it to the people or any portion of them to decide the question of

expediency. In all such cases the Legislature must declare the law expedient if the event shall happen, and inexpedient if it shall not happen. It is impossible under the law for the Legislature to delegate to others the responsibility of deciding whether a law is expedient or proper.

The act under discussion transfers this responsibility to the majority of the registered voters of the respective election districts. Whether liquor shall be sold by the applicant is made to depend upon the whimsical notions of the majority of the registered voters of the respective precincts. They are metamorphosed into a law-making power and must breathe life into this statute before it has vitality. This is clearly the law, and if the law was without any other objectionable feature would be sufficient to render the law unconstitutional.

It is a principle of law that where the same clause or a similar one exists in the Constitution of other States that great weight should be given to the construction that such clauses have received in the courts of their States. Langdon vs. Applegate *et al.*, 5 Md., 327; Ash vs. Parkinson, 5 Nev., 15; Hen vs. Page, 7 Ind., 23.

The Constitution of the State of Florida is very similar to that of Indiana and of Iowa.

Section 18, Article 4, of the Constitution of the State of Florida provides that " all laws shall be general and of uniform operation throughout the State."

The act under discussion is violative of this provision. It is not uniform in its operation. The words of uniform operation are not meaningless. The courts have given them a well defined and certain meaning. The provision that all acts of a general nature shall have a uniform operation refers to the practical working and effect of a law. Gerbrick vs. State, 5 Iowa, 491; People vs. Coleman, 4 Cal., 46; People vs. Judge, 17 Cal., 547.

This law is not uniform in its operation, and no construction or contortion can make it uniform in its operation. The practical working and effect of this law is to affect the people of one county in one way and of another county in another way; to affect the people of one election district in a different way from the people of another district. Indeed its practical working and effect is to mandatorially shape the fortunes of one citizen in a manner different from those of another. Indeed its practical working and effect is to allow one man to make money by the sale of liquor and to prohibit another living in the same district under the same laws from making a competency in the same way. The law as it stands is the most tyrannical discrimination against the citizen that ever appeared upon a statute book. It resolves itself into a sovereign State, putting up the personal popularity of one man against another man. It is simply this and nothing more, and the Constitution of this State does not tolerate the idea that a preference should be given one of its citizens over another because his ways and methods may have won him more popularity.

Under the Constitution of this State the officers are defined, and we nowhere discover such an office as the office of liquor dealer, but this law in its practical effect creates such an office. For it makes the right to exercise the calling of a liquor dealer dependent upon the endorsement of the majority of the registered voters of the district.

The act is not strictly speaking a local option law. It has not the fairness of such a law. Under a local option law the question is submitted whether liquor shall or shall not be sold. This law submits no such question. It says that liquors may be sold, but leaves it to the whim and caprice of the changing and changeable multitude to say whether this man or that man shall be allowed to sell. Whether John Jones is a better man than Bill Jackson,

depriving it of that uniform operation that the Constitution requires all laws to have.

Section 16 of Article 6 of the Constitution provides that no other courts than those herein specified shall be organized in this State.

This clause is violated in this act under consideration. Sections 2, 5 and 6 of the act provide in terms unmistakable for the establishment of a court. Section 2 of the act provides for the meeting of the County Commissioners to hear the petition of an applicant for a license, and section 5 of the act constitutes them a court to take the proof and hear and determine upon an affidavit made, that charges any person who has been able to procure a license with an infraction of the law as to his guilt or innocence. These two sections are so intimately interwoven with and so much a part and parcel of every other section of the act as to nullify it entirely. In other words, if the sections constituting the County Commissioners a court are unconstitutional then the whole act is void. For these sections constitute the very woof and warp of the law; and so connected with each and every section of the act as to impregnate them with the unconstitutionality by which they are enacted.

The act under consideration was approved March 3d, 1883. The act entitled an act for the assessment and collection of revenue was approved March 5th, 1883. Section 13 of this act provides for the issuing of a license upon the payment of the requisite fees without qualification. The question arises, does not this act work a repeal of the other?

Again, we contend that the law is against public policy.

Any law that is inevitably productive of vicious results is undoubtedly against public policy. For the very spirit of the law is in harmony with all that is noble and elevat-

ing. Its policy is opposed to all that is debasing or which tends to debase, and laws which tend to debase, whether by design or by accident, are against public policy.

The law under consideration, if followed to its natural results, will be baneful in the extreme. Its tendency is to wrest the liquor business from the hands of the better element of dealers and place it in the control of the more corrupt and venal. For it may be that an honest, respectable, fair-minded dealer may not be able to procure the endorsement of the majority of the registered voters, except by practices to which he would not resort. Not so, however, with the evil-minded and wickedly-disposed citizen. He would not hesitate to go out into the byways of life to give an ignorant and corrupt voter a drink or dollar for his endorsement, and thus purchase the requisite majority, and afterwards add perjury to his other crime by taking the oath required by the act. Thus the law not only gives the liquor trade into the hands of the vicious, but also leaves the determination of who shall or shall not be dealers to the most ignorant and besotted of a community. This must be the result, and because of this pernicious result I submit that the law is bad in morals and against public policy.

*John T.* and *Geo. U. Walker* for Relator.

I shall not undertake to go over any of the ground already occupied by my associate. Indeed, most of what I shall say will be on the concession, *for the sake of the argument*, that the positions we there assumed are untenable.

Pursuing, then, the line of argument indicated let us concede that the act in question, " An act to regulate the sale of liquors," &c., approved March 3d, 1883, is the exercise by the Legislature of a police power.

We concede that it is perfectly competent for the Legislature, with the approval of the Governor, *to regulate the*

*sale of liquor ;* that there is nothing to be found in the Constitution of the State *or of the United States* inconsistent with the exercise of such a power; that, therefore, this enactment, in respect of the purpose disclosed in its title, is obnoxious to no constitutional provision. Hence its unconstitutionality must be found, if at all, in *the details* by which *its purpose* is sought to be effected.

Again, we fully assent to the canon that this enactment cannot be declared unconstitutional unless it *plainly* and *palpably* violates or disregards some provision of the State or Federal Constitution. Whenever we allege that it, or any provision of it, infringes a constitutional provision, we must put our finger on the provision, and if there be, after a careful consideration thereof, a reasonable doubt, it must be resolved against us and in favor of the law.

So far, then, we are in harmony with our adversaries. What, then, are the details of the enactment which violate the organic law? How does the *modus operandi* defeat the the general purpose of the law ? These are the questions, and the burden of answering them so as to leave no doubt we recognize to be on us.

*The XIVth amendment to the Constitution of the United States* declares that "all persons born or naturalized  *   *  *   *   are citizens of the United States and of the State wherein they reside. No State shall make or *enforce* any law which shall abridge the privilege or immunity of citizens of the United States, nor shall any State  *   *   *   *  deny to any person within its jurisdiction the equal protection of the laws."

Section 11 of the Bill of Rights, Constitution of Florida : " All laws of a general nature shall have a uniform operation."

Section 18, Article IV : " In all cases enumerated in the preceding section, and in all other cases where a general

law can be made applicable, all laws shall be general and of uniform operation throughout the State."

The act in question is general in its nature. It is a general law, applicable to the whole and every portion of the State. Upon this proposition there is no diversity of views. Now, we submit that it violates (1) the latter clause of the 14th amendment to the Constitution of the United States, (2) the section (11) above quoted of the Bill of Rights, and (3) in its lack of uniformity of operation throughout the State. Section 18 of Article 14, before cited.

There is, we suppose, some difference between Section 11 of the Bill of Rights, and Section 18 of Article 4 of the Constitution of the State. The uniformity referred to in the former being as to persons and things ; in the latter as to the territorial sub-divisions.

If this be a correct assumption it would seem that Section 11 of the Bill of Rights and the 14th amendment compass the same object ; to prevent, among other things, " any discrimination between persons or the granting of an indulgence to one which is not granted to another standing in the same relation."

Of course we do not maintain that the 14th amendment, as applicable to this question, inhibits the State from legislating upon or regulating any subject which it previously could, but only requires that such action shall apply equally to all persons in the same *particular* or general jurisdiction standing in the same relation *of citizenship to the subject matter of the legislative action.* It was not therefore designed to prevent the Legislature of any State from " regulating," *in any manner it might deem fit,* the sale of liquors within the State, or within any particular portion of the State, so only that the regulation should apply to all citizens therein *equally.*

In Missouri vs. Lewis, 101 U. S., it is held that the

amendment was intended, in this respect, to control legis-
lation only in its application to persons, which ruling is in
accord and not at all in conflict with the case in 18 Wallace,
p. —, cited by the Attorney-General, as is perfectly plain.

Ex-parte Virginia, 100 U. S., bot. p. 346, *et seq.*, is more
full to the same point. See, also, the dissenting opinion of
Justice Field, concurred in by Clifford, J., pp. 367 and 368.
We quote from the dissenting opinion the following, as *to
which*, however, there is no dissent among the Justices:
"The equality of the protection extends only to civil rights
as distinguished from those which are political or arise
from the form of government and its modes of administra-
tion, and yet the reach and influence of the amendment are
immense. It opens the courts of the country to every one,
on the same tenor, for the security of his person and prop-
erty, the prevention and redress of wrongs, and the enforce-
ment of contracts; * * * * it allows no impediment to
the acquisition of property and the pursuit of happiness,
to which all are not subjected; it suffers *no other or greater
burdens or charges* to be laid upon one than such as are
equally borne by others. * * * * * *
It secures to all persons their civil rights upon the same
terms. * * * * * Much confusion has arisen from
failing to distinguish between the civil and the political
rights of citizens. *Civil rights are absolute and personal.
Political rights* on the other hand are *conditioned* and *depend-
ent* upon the discretion of the elective or appointing power,
whether that be the people, acting through the ballots, or
one of the departments of their government. The civil
rights of the individual are never to be withheld, and may
always be judicially enforced. The political rights which
he may enjoy are qualified because their exercise depends
*on his fitness* to be adjudged by those whom society has
clothed with the elective authority." See also Strauder vs.
West Virginia, Id., 303.

We think that it sufficiently appears from these and other authorities that this amendment was designed to reach to every citizen that though " primarily assigned to give protection to persons of the African race  *  *  *  * the generality of the language used necessarily extends to all persons of every race and color." Field, J., 100 U. S., on p. 361.

Well, does this enactment give this equal protection ? Or, what seems to be the equivalent question.: does it operate uniformly upon all persons who may desire to become dealers in liquor ?

The word uniform as used in this connection cannot well be defined, so as to cover every case that may arise. The difficulty was felt and expressed in McConihe *ex rel.* vs. McMurray, 17 Fla., 266. His Honor, Justice Westcott, in making the application to the enactment then being considered, sought the light of analogy. Quoting from the Supreme Court of Arkansas, he says : " Taxing by a uniform rule means by one and the same *unvarying* standard ;" from the Supreme Court of California, construing the expression that " taxation shall be equal and uniform," " it cannot discriminate between persons or grant an indulgence to one which it does not grant to another standing in the same relation ;" from the Supreme Court of Louisiana, when applying the constitutional provision of that State, " that taxation shall be equal and uniform throughout the State," he says : " It would preclude *a discrimination as between those carrying on the same business ;*" and so the Supreme Court of California in Smith vs. The Judge of the Twelfth District, 17 Cal., 554, held that a law to be uniform must bear equally in its burdens and benefits upon persons standing in the same category."

The petitioner, Henry W. Arpen, is a citizen of the U. S. and of the State, and of full age. The business of a liq-

uor dealer is, under the Constitution of this State, a lawful pursuit. In order to its pursuit every person who engages in it must pay a license tax (authorized by the Constitution) of a certain amount for every place where he carries on the business. This he has done, or what is the same thing, has made a lawful offer to do so. Of course the license is not essential to his protection. It is only evidence that he has complied with the law ; but that may otherwise be shown. He proceeds to engage in the business, is arrested, tried, condemned and punished. His neighbor, also a citizen of the United States and of the State, and of full age, does precisely the same thing with impunity. Here is a different application of the criminal law to two persons apparently occupying the same relation—whose civil rights ought to be the same and who ought to be equally protected ; but we are informed that while they do stand in the same relation to the State and the U. S., and to the government and the laws in general, they do not occupy the same social or moral status. They don't stand in the same relation as persons to the majority of the electors of the neighborhood, and this majority have granted the indulgence to one but were unwilling to grant it to the other.

But the authorities cited as well as, it seems to us, the plainest reasons that such a relation as this cannot be contemplated. By persons standing in the same relation can only be meant, persons possessing the same attributes of citizenship, not holding the same place in the affection or esteem of their fellows.

The law must be that there can be no discrimination between persons in the same locality and jurisdiction and standing in like relation to the law ; that for any privilege conferred the qualifications must be the same for all, and those qualifications must be such as they can comply with by their exertions, not such as one or another may or may

not be able to comply with according as the fluctuating caprice of those around him may permit—the qualification, the standard, must not be such as to leave it to the decision of an unorganized, irresponsible, constantly changing body, whether he possesses these qualifications or comes up to the standard. A body unknown to the law, except in connection with the elective franchise, responsible to and accessible by no court, from whose decision made upon no settled rule or principle there lies no appeal anywhere of any kind. Surely the civil rights of the citizens of the United States and the States can't be dealt with in that way.

If a discretion can be by Legislature vested anywhere to determine who of the citizens shall alone engage in this lawful pursuit, to decide upon the fitness of any who may choose to engage in it, surely that discretion should be confided to some agency of the government, organized and recognized by the law, known by and accessible to the citizen. We do not use the words "should be" in respect of the policy of the enactment, but in reference to its equal protection and uniform operation to and upon all persons.

Where is this body whose assent I must obtain before I can follow a business that other citizens are engaged in, how can I find it, and how must I apply to it? What are the rules that are to govern my application, and what are the principles by which they are to decide on my application. In order to place me and the other on a plane of equality before the law I have a right—a citizen's right—to know these things. Equality under the law, uniformity of operation of the law, demands that whatever restrictions, conditions, qualifications or burdens are imposed upon the exercise of any legal right by any citizen they shall be certain, fixed, paramount, unvarying, a compliance with which by any one shall not be defeated by the mere

temporary and evanescent sentiment of any or all of the electors.

The case of Groesch vs. State, 42 Ind., 557, and another case, referred to by the Attorney-General, from the State of Mississippi, are the only ones that have discussed laws similar to the one in hand. The case mentioned held similar laws under similar State Constitutions valid, and the case from Indiana fairly covers all the points we have made, and decides them all against our positions. But, it is to be observed that the influence of the fourteenth amendment was not invoked in either of the cases, nor were the objections there urged tried by some of the tests we offer here.

All the other cases relied upon by counsel for the motion are essentially different from this. They involved the question of a delegation of the law-making power. They involved no question touching the equality and uniformity of their operation upon the citizen. In those cases the law, whether it was to be operative or remain dormant, affected all citizens equally and alike.

And of these cases much relied on, State vs. Court of Common Pleas, 36 N. J., does, indeed, strongly imply that no allegation of any power under the law can be made except to some recognized formal agency or functionary of the State.

That class of cases have all been discussed in the brief of our associate, Mr. Hartridge.

This enactment clearly puts it in the power of a body of electors to enable one citizen to exercise and enjoy a civil right, for the exercise of which another would be punished upon no other, higher or better ground than that they capriciously and arbitrarily so willed it. Would these two persons enjoy the equal protection of the law? No, the one or the other becomes a criminal or an innocent man, not

according to any settled, permanent, uniform rule of law, but according to the whim for the time being of those who belong to neither department of the government, the judicial, the executive or the legislative.

The Board of County Commissioners have no discretion, they are mere instruments of the will, as it happens to be, of a majority of the electors. Whatever discrimination this ever changing body of people may make among the citizens under this law the County Commissioners must obey.

The citizen to-day who stands to the State and the law in the complete relation of a law-abiding, peaceable and orderly citizen becomes to-morrow, nay, in an hour, changed by the same law into a violator in the law, a criminal, without having, in any particular, changed his conduct from a law-abiding into a law-breaking citizen, because, and only because, the sentiment of his neighbors, either as to him or his business, or the business he is doing has changed. His neighbor in the same locality, the same jurisdiction under the same law, pursues the same business lawfully, not because of any difference of any kind between him and the criminal other than in the favoritism of their fellows.

Can that command the respect due to a law or a regulation which punishes one man for a line of conduct which another follows with impunity? Does the law afford equal protection which fines and imprisons one for doing what is legalized when done by another who stands in the same relation? Be it observed that this equality of protection and uniformity of operation has reference to the relation occupied by the citizens at the time the regulation was enacted into the form of law.

*When a statute is enacted* the question is, does it give equal protection to all persons? Does it operate uniformly upon all persons? It will not do to answer yes upon all persons

who may chance to stand in like relation to the public majority from time to time.

An eminent writer on political science says: " The system of special legislation from top to bottom is based upon a supposed necessity, which is taken for granted as existing that privileges may be conceded to one or a few which · it is not safe nor politic to concede to all. Nature never acts in this way, nor will thoroughly enlightened governments do so when they exist. It is unnecessary to dilate upon this abuse, which may safely be set down as the greatest danger to which any system of government is liable. It may almost be said to be the root of all public ills. Legislation should know nothing of individuals. All modern thought tends to the conclusion that the universe is governed by general laws, and a belief in special providences is entertained by only the most superstitious. A sound system of government should recognize individuals no more than the laws of nature recognize them. The law should apply to all without discrimination for or against."

The general revenue law, approved March 5, 1883, authorizes the Collector of Revenue to issue a license to deal in liquor upon the payment of the license tax and the clerk's fee. Sec. 11.

Whether the provisions of that act and the requirement of Section 2 of the act of March 3, 1883, can stand together is submitted to the enlightened judgment of this honorable court.

The parts of the last act which invest the County Commissioners with judicial functions are manifestly unconstitutional. Whether they are so inseparably connected with the other portions of the statute as to make them necessary to its life, we also submit to the court, only remarking that the only license provided for by this act is one which is *conditioned* to be suspended or revoked *by the Board of*

*County Commissioners* for any of the causes *hereinafter* set forth.

*The Attorney-General* for the Motion.

I. Neither the act of March 5th nor any other act attempts to specially or expressly repeal the act of March 3. There is not even a general repealing clause to the act of March 5th. It expressly repeals for certain purposes the general revenue law of 1881, but not any other law.

If there is any repeal of the act of March 3d by that of March 5th, it is by implication. The third sub-division of section 11th of the act of March 5th provides that dealers in spirituous, &c., liquors shall pay a license tax of $300 in each county for each place of business, and dealers paying the same and receiving a license therefor shall be authorized to sell spirituous, &c., liquors. This statute provides for a county tax and for licenses. It is a familiar rule that repeals by implication are not favored in law, and that a subsequent statute will not be construed to repeal a former, unless the two cannot co-exist. They must be irreconcilable before a repeal will be regarded as intended or resulting.

Another rule is that all acts passed at the same session are to be taken in *pari materia*, and receive a construction that will give effect to each, if possible. Fla. A. & G. C. R. R. Co. vs. P. & G. R. R. Co., 10 Fla., 160; Mitchell vs. Duncan, 7 Fla., 13.

Another rule is that all acts in *pari materia* should be taken together as if they were one law. Mitchell vs. Duncan, 7 Fla., 13.

The third section of the act of March 3d provides that no Collector of Revenue of any county shall issue license to any person * * * unless a permit is presented from the Board of County Commissioners. This permit is that

authorized by section 2 to be issued under said act of March 3d on the petition of the applicant *to sell intoxicating liquors.* Such petition has to be signed by the applicant and a majority of the registered voters of the election district in which he desires to make sales of such liquors. The first section provides that it shall not be lawful for any person * to sell any intoxicating liquors * * in any election district in any county in this State, " except as hereinafter provided." The *license* referred to in the 3d section is not authorized by this act. Of course it is a license as to the same subject-matter, *i. e.*, the sale of liquors. In this act of March 5th we find provision made as to the Collector of Revenue issuing licenses for the sale of spirituous liquors, and the manner and mode of issue provided in this act of March 5th is the same as was provided in the general revenue act of March 5th, 1881, and the license tax is the same as was provided for by said act of 1881. These acts being in *pari materia,* in so far as the liquor dealer's license is concerned, are to be so far construed as one law, and as the act of March 3d refers directly and clearly to a license authorized at the date of its passage by an act for which the act of March 5, 1883, is a substitute, and which substitute continues the same license, what can be clearer than that the law-makers did not intend that the act of March 5th, 1883, should not repeal the act of March 3d by merely continuing the license for which the act of 1881 had provided, and which the act of March 3d referred to. This would be so, I mean, even if the act of March 3d had become a law before the Legislature had acted on the bill which culminated in the act of March 5th, 1883 ; but when we consider the fact that the Legislature had even adjourned before either bill became a law ; that they were passed by the Legislature as concurrent prospective regulations of the same subject, and that the act of

March 5th, 1883, was not enacted by the Legislature with the understanding that the act of March 3d existed as a separate, independent and unqualified law, it is impossible, I respectfully submit, to come to any other conclusion than that the Legislature intended that the two measures should regulate the one subject. There is moreover no inconsistency whatever. Each is cumulative of the other, and each can stand without any strain or warping of the rules of construction.

This question seems so plain to my mind that I have not felt justified in giving it any more of the limited time intervening between this hour and the calling of the case for argument.

II. The second contention that will be made is that the act of March 3d is unconstitutional.

I know of no provision of our Constitution which is violated by it.

Regarding the statute as one for the assessment and collection of taxes for State, county or municipal purposes, or for the punishment of crimes or misdemeanors, or of any other character coming within sections 17 and 18 of Article 4 of the Constitution, I am unable to see that it is either a special or local law, or that it is not of a general and uniform operation throughout the State.

There is nothing whatever, by word or meaning, in the statute that implies that it is a statute which shall apply merely to the cases of special or particular persons of the same class, or be in force in one locality and not in another in the State. It is the law unto every one who proposes to be a liquor dealer, whosoever he may be, and no part of Florida is exempt from its provisions.

In McConihe vs. State ex rel., 17 Fla., 267, this court quotes approvingly the following language from the Supreme Court of Iowa as to the constitutional provisions in

that State providing that " the General Assembly shall not pass local or special laws for the incorporation of cities and towns," and " that all laws of a general nature shall have a uniform operation," viz : " These laws are general and uniform not because they operate upon every person in the State, for they do not, but because every person who is brought within the relations and circumstances provided for is affected by the law. They are general and uniform in their operation upon all persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation."

In California, (17 Cal., 554,) says our court, the Supreme Court held that " a general law of uniform operation was such a law as bore equally in its burdens and benefits upon persons standing in the same category."

In Indiana, where the constitutional provisions are like ours, the Supreme Court says : " It cannot be held that the framers of the Constitution intended that the operation of laws throughout the State should be uniform in any other sense than that their operation should be the same in all parts of the State under the same circumstances and conditions." Groesch vs. State, 42 Ind., 547.

The case of Groesch vs. State was a very similar law to this one in question.

As a part of the machinery which one desiring a liquor license has to use, and consequently as a part of the license tax law, it is not antagonistic to the constitutional provision that the Legislature shall provide for " an uniform and equal rate of taxation," (Sec. 1, Art. XII,) because the taxing part of the law taxes by one and the same unvarying standard, and does " not discriminate between persons or grant an indulgence to one which it does not grant to another standing in the same relation," (35 Cal., 616 ;) and it

does not make a discrimination as between those carrying on the same business, but imposes like taxation upon all persons in the same trade or calling.   17 Fla., 266.

This statute does not violate the provisions of Section 1, Article 4, by committing legislative power to the people. Groesch vs. State, 42 Ind., —; Rohrbecker vs. City of Jackson, 51 Miss., 735.

It is not a local option law.   Cases cited above.

This act does not delegate any authority to make laws. The Legislature has in it made a plain, unqualified command and requirement of what must be done to secure a liquor license.   No act of the people, or any part of them, or of any agency in any sub-division of the State, is necessary to give it application as a law whose rules are to be followed.   This is clearly settled by the cases from Indiana and Mississippi.   In the light of the cases from other States referred to and read by us at the bar, the Legislature could have gone much further in submitting the question of the utility of the statute as a law, to the people of the territorial sub-divisions of the State.   These cases are: Locke's Appeal, 71 Penn., 491 ; State vs. Wilcox, 42 Conn., 364 ; Commonwealth vs. Bennett, 108 Mass., 27 ; State ex rel. vs. Court of C. P. of Morris, 36 N. J. (Law), 72 ; Anderson vs. Commonwealth, 13 Bush., 485.

The decisions from Indiana, Mississippi, New Jersey, Connecticut, Massachusetts, Kentucky show that the regulation or prohibition of the sale of liquor belongs to the police powers of a State.   In these decisions are to be found references to others.   In Mississippi the gentler sex is given a voice as to whom shall be licensed.   The cases show that the regulations of our system are neither novel nor extraordinary.   See, also, State ex rel. Hensall vs. Ludington et al., 33 Wis., 107 ; Comm. vs. Blackington, 24 Pick., 352.

This statute is an experiment in Florida. None will deny that the evil it seeks to ameliorate is as great as is known to man. Is it not the greatest evil known? Has it not borne to our race more misery than any agency that exists? The agonizing echo of its ceaseless tread has resounded in homes and hearts made desolate by its triumphs throughout time, and every sentiment of humanity approves the effort to arrest its ravages. The framers of our National and State Constitutions have, however, made no ramparts for its protection, which make any appeal to the sentiment of courts at all necessary, even if they could be listened to when against organic law.

In the argument filed by Messrs. John T. and Geo. U. Walker it is conceded " that it is perfectly competent for the Legislature, with the approval of the Governor, to *regulate the sale of liquor;* that there is nothing to be found in the Constitution of the State or *of the United States* inconsistent with the exercise of such a power; that therefore this enactment, in respect of the purpose disclosed in its title, is obnoxious to no constitutional provision;" and that " hence its unconstitutionality must be found, if at all, in *the details* by which its purpose is sought to be enforced."

After quoting from the 14th amendment to the Constitution of the United States, and quoting the 11th Article of the Florida Bill of Rights, and quoting Section 18 of Article 4 of the State Constitution, they say : " The act is general in its nature," and " is a general law, applicable to the whole and every portion of the State;" but they contend it violates the latter clause of the 14th amendment, Section 11 of the Bill of Rights, and that it lacks uniformity of operation throughout the State. They assume that Section 11 of the Bill of Rights differs from Section 18 of Article 4 in that the former refers to *persons and things* and the latter to territorial sub-divisions; the

former and the 14th amendment compassing the same object to prevent among other things "any discrimination between persons or the granting of an indulgence to one, which is not granted to another standing in the same relation." They "do not maintain that the 14th amendment as applicable to this question inhibits the State from legislating upon or regulating any subject which it previously could, but only requires that such action shall apply equally to all persons in the same *particular* or general jurisdiction standing in the same relation of citizenship to the subject-matter of the legislative action." "It was not," they say, "therefore, designed to prevent the Legislature of any State from regulating, in any manner it might deem fit, the sale of liquor within the State or any particular portion of the State. So only that the regulation shall apply to all citizens therein *equally.*"

In the case of Bartemeyer vs. Iowa, 18 Wall., 129, it is held by the Supreme Court of the United States that the 14th amendment did not interfere with the right of the States to either prohibit or regulate the traffic in or sale of liquors (with one solitary exception useless to mention here) by virtue of their *police powers.* The liquor traffic is not a "privilege or immunity" which this amendment was intended to prevent the abridgement of.

In Missouri vs. Lewis (101 U. S. Repts., p. 22,) the Supreme Court of the United States holds that the provision of said amendment that no State "shall deny to any person within its jurisdiction equal protection of the laws" contemplates "the protection of persons and classes of persons against unjust discrimination by a State," and does not even "relate to territorial or municipal arrangements made for different portions of a State."

Now with all deference I ask what persons or class of persons does this act discriminate against at all. It pre-

scribes a certain permit as a necessary instrument for any one who desires to obtain a license from a Collector of Revenue to sell liquors, and also prescribes a method of obtaining such permit, but what person or persons does it say may get such permit by any other method or such license without such permit? None whatever. Jones, Smith, Williams, Tomkins and Selladrink, all have to tread the same mill. What class of persons is excluded from the rules it prescribes? Is the native white citizen excluded from and the negro included within its rigorous system, and the naturalized white citizen given a chance to get a license on less rigorous terms than the colored citizen? No, there is not one word of discrimination against any person or class of persons. It prescribes the same uniform rule to all classes all over the State.

In the case of Ex-parte Virginia, 100 U. S. Sup. Ct. Repts., there is not a word from which it can be argued that this statute of itself makes any discrimination, whether it be in the opinion of the court or in the dissenting opinion from which the counsel quoted. Dissenting opinions are not usually very convincing documents, and have not the authority of law.

The question of uniformity has been fully discussed. Whether we take the Bill of Rights Article, or Section 18 of Article 4, and whether we adopt or not the assumption of counsel that the former refers to " uniformity as to persons and things, and the latter as to territorial sub-divisions," the statute is uniform as to all persons who may seek to avail themselves of it and as to territorial sub-divisions.

The fact that "A " can and " B " cannot comply with the requirements which a statute makes of the whole alphabet of citizens will hardly ever be taken as even a shadow of reason that the requirements are not general and uniform to all persons desiring to do that as to which these require-

ments are prescribed, and no authorlty has been produced to support such a theory.

The cases from Indiana and Mississippi dissipate at once all the mist which the remarks about " fluctuating caprice" of the majorities, and inability to comply therewith, are desired to raise. Not a line of law has been shown to the effect that such regulations by majorities are unconstitutional. There is no room for doubt in the light of these cases, interesting as the genius of counsel makes his plea against them.

In Iowa the Constitution declared that " all men are equal and endowed with the right of acquiring, possessing and protecting property," and forbid the General Assembly granting " to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens." It was held by the Supreme Court that a statute providing the granting of permits to persons of good moral character who are citizens of the county to sell intoxicating liquors was not in conflict with such provisions of the Constitution. In re Ruth, 32 Iowa, 250.

I am unable to see that this statute is within the theory prescribed by the eminent writer on political science from whom a quotatiou is made. This statute does not " recognize individuals," but it does apply to all without discrimination for or against. It is a general law, and there are in it no " special providences " for one or another applicant for its benefits or burdens.

It is unnecessary for this court to decide the constitutionality of the sections or provisions giving to the County Commissioners the power to revoke the license issued by the Collector of Revenue. So far as constitutionality of the parts of the statute authorizing the issue of the permit by the County Commissioners—a power which the writer of the first and second sections seems desirous of conceal-

ing, judging from the language used—are concerned I am willing for the sake of argument to admit that the parts giving power to the Commissioners to revoke the Collector's license are void. The two powers are entirely distinct, and neither is at all dependent upon the other. One is a power to one *body* to issue a permit which is a condition precedent to obtaining a *license* from *another* officer, the other. is a power in the *body* to revoke this *license* so issuing from the other *officer*. It is not a case in which it can be said the Legislature would not have granted the power to issue the permit without giving the power to suspend the license. You can strike out all the provisions as to revoking the license and there is left a complete system as to issuing the permit. Cooley's Const. Lim., 177, 181, m. p.

*R. B. Hilton* handed to the court a law journal containing, we understand, an article on the question. It has not been furnished to the Reporter. He also filed the following paper:

We presume no one would have the hardihood to contend that the retail sale of intoxicating drinks does not tend, in a large degree, to demoralize the community, to foster vice, produce crime and beggary, want and misery. And if such is its tendency, it should not have unrestrained license to produce these results. If sanctioned at all, it should be under restraints that will suppress, or at least mitigate, such evils to society.

From an early period in civilization in all countries the unrestricted sale of such drinks has been regarded as pernicious. Hence, as is believed, in the code of laws in every civilized State it has, at all times, been regulated and put under restraint. In this respect it has formed an exception to other legitimate business, and it is believed to have resulted from humane feelings and a desire to suppress im-

morality, vice, crime and disorder and the other miseries that follow in its train.

This restraint is not the peculiar growth of any particular political faith, or of any creed or sect, but seems to be a desire implanted in one's nature to protect our race and kind from such evils ; and it is implanted in the police power of State, and may be exercised as the law-makers shall deem for the best interests of the people. Its pernicious tendency would fully authorize its exercise, even to its absolute prohibition as an article of sale.

THE CHIEF-JUSTICE delivered the opinion of the court:

Arpen applied to the Collector of Revenue for a license to sell intoxicating liquors, tendering the amount required by law. The Collector refused to issue the license upon the ground that the " act to regulate the sale of liquors, wines and beer in the State of Florida by the Boards of County Commissioners of the several counties " had not been complied with. This act was approved March 3, 1883, and is designated as Chapter 3416. Arpen then obtained an alternative writ of mandamus from this court directing respondent to issue the license or show cause, &c. On the return of the writ respondent moves to quash upon the ground that the act of March 3, Chapter 3416, had not been complied with. Sections one and two of this act require of the person wishing to sell such liquors in any election district that he shall make application to the Board of County Commissioners, at a regular meeting, for a license, which application must be signed by a majority of the registered voters of the election district, as shown by the registration list, asking the Board to grant to him the right to sell liquors. The applicant is required to make oath that every signature to the application is genuine, and that there was no fraud, bribery or deception in procuring the signatures.

Each signature must be attested by two credible witnesses, and the petition must be published in a newspaper in the county, or if there be no such paper, it must be posted at the county site and in the election district for two weeks before the meeting of the Commissioners.

The third section forbids the Collector to issue the license unless a permit is presented from the County Commissioners, and provides that the license shall contain a provision that the same may be suspended or revoked by the Board of Commissioners for cause, to-wit: selling liquors, wine or beer to a minor or person intoxicated.

The fifth and sixth sections provide that on complaint that the licensee has violated this provision the license may be suspended and revoked when, notice having been given of any complaint, it shall appear, by the proofs to be taken before the Board, that there has been such violation, the Board hearing and determining the same.

It is claimed by the relator that the act is inoperative, because it is " not complete in itself;" that it contains no provision for issuing a license, or on what terms it shall be issued.

The Legislature, at the session of 1881, by Chapter 3219, had enacted that State licenses should be issued to dealers in spirituous liquors by the Collector of Revenue on the payment of three hundred dollars for each place of business, and that counties and incorporated towns and cities might exact a further amount, not exceeding fifty per cent. of the State tax, the license to be signed by the Collector and Clerk of the Circuit Court.

By an act approved March 5, 1883, Chapter 3413, the act of 1881 was repealed, but the provisions above referred to were re-enacted to all practical intent, it being an act revising the revenue law of the State.

There is no incongruity in the acts of March 3 (prescrib-

ing the conditions and mode of applying for the license) and the act of March 5th, which fixes the amount to be paid on issuing the license. The two acts relating to the same subject-matter are in entire harmony as to their practical operation.

But it is contended that because the act approved March 5th is operative in itself and does not require a petition or the action of the County Commissioners to authorize the issuing of a license, its operation and effect is to repeal the act of March 3d. There is nothing in the act of March 5th expressly repealing anything except the act of 1881, but it is urged that the act of March 3 is repealed by necessary implication by that of March 5th, that being a later act it supersedes the former.

The answer to this is that there is no incongruity between them; that the act of March 3d had not been approved and was not a law when the last act was passed; and the Legislature adjourned on the second day of March, leaving both acts in the hands of the Governor for his approval, thus indicating that the Legislature intended that both should become laws. It can scarcely be contended that the Governor intended that one should repeal or defeat the other by signing the one on Saturday and the other on Monday, even if it lay in his power thus to destroy the effect of the former. He signed both in furtherance of the legislative will, and doubtless if the revenue law had first come to his attention he would have signed it first. There is nothing here to indicate that the act last approved was intended to repeal the first, and the acts being in *pari materia* must be upheld if both can be made effective. Fla. A. & G. R. R. Co. vs. P. & G. R. R. Co., 10 Fla., 145, 160; Mitchell vs. Duncan, 6 Fla., 13, and authorities cited; House vs. State, 41 Miss., 737.

It is urged that the fifth and sixth sections are unconsti-

tutional in that they create a judicial tribunal unknown to the law, by investing the County Commissioners with judicial power to hear, try and determine a complaint against a licensed dealer and to impose a penalty, *i. e.*, to revoke the license ; and it is claimed that these sections are so interwoven with the act of March 3 that the whole act is tainted with illegality.

While we agree that the provision of the sixth section does attempt to confer judicial power upon the Board in the respect stated, and that so much of the fifth and sixth sections as is liable to this objection is void under the constitutional provision which forbids the creation of courts not mentioned in the Constitution, yet if those sections were entirely eliminated the act would not be in the least affected in respect to its general purpose as expressed in its title.   The act yet remains entirely operative to provide the method of making application to the Board and obtaining its permit to the issuance of the license which is the purpose of the act. · The objectionable sections relate to a proceeding to annul it, a feature by no means essential to the operation of the act in other respects.   An act may be void in part without affecting other portions of it, if that which remains is capable of being executed in accordance with the purpose of the Legislature wholly independent of that which is rejected.   Cooley's Con. Lim., 177, 180.

It is further claimed that the practical working of the law would be pernicious, promotive of criminal and demoralizing practices, and is therefore void as against public policy.   It is argued that " its tendency is to wrest the liquor business from the hands of the better element of dealers and place it in the control of the more corrupt and venal. For it may be that an honest, respectable, fair-minded dealer may not be able to procure the endorsement of the majority of the registered voters, except by practices to which he

would not resort. Not so, however, with the evil-minded and wickedly-disposed citizen. He would not hesitate to go out into the byways to give an ignorant and corrupt voter a drink or a dollar for his endorsement and thus purchase the requisite majority and afterwards add perjury to his other crime by taking the oath required by the act." The act is thus said to be bad in morals and against public policy.

This is a harsh arraignment of the legislative branch of the government which would pass an act tending to sacrifice the moral life of the community. If the argument were addressed to the Legislature it might be induced to prevent the threatened mischief by requiring that there should be an entire prohibition, or an unanimous *call* to the business, instead of the consent of a purchased majority. But this is not an argument to be addressed to the courts.

The Legislature alone must deal with measures of mere public policy in respect to these as well as other affairs of public propriety and welfare.

The practical result of sweeping away this restrictive act would be, that any bad man in the community might go to the Collector and pay the license tax and *demand* a license and invoke the whole power of the State to compel the Collector to issue it to him, though no sane man in the county would sign his application; for the law of 1881, re-enacted by that of March 5th, 1883, reads : "Which license shall be issued to each person on receipt of the amount hereinafter provided." It was doubtless with the view to prevent the sale of intoxicating liquors by persons who ought not to be entrusted with the agency, that the act approved March 3d was passed.

Another objection to this act is that it contravenes that provision of the Constitution which requires that all laws of a general nature shall have uniform operation through-

out the State.   [Sec. 17, Art. 4, of the State Constitution
enumerates certain cases in which *no* local or special law
shall be passed.   The other provisions of the State Consti-
tution are set out on pp. 574–5 of this volume.—REP.]
It was conceded in the argument that the act is not
what is termed a "local option" law, *i. e.*, a law to take
or not to take effect in a given locality upon the con-
sent or dissent of the voters of the locality, or upon
other contingency while it may have effect in other locali-
ties.   There is nothing in the act providing that it is to
take effect or not, either generally or locally, upon any con-
tingency.   There is nothing in it indicating that licenses shall
or shall not be granted upon the assent or dissent of the ma-
jority of voters anywhere.   It simply provides that a license
shall not be granted to the particular individual unless upon
these several conditions :  1, that his application must be
freely signed by a certain number of voters requesting that
this person be granted a license to sell liquors in a designa-
ted place, and 2, that he pay for the privilege a certain sum
of money.   The act is uniform in its operation throughout
the State, and uniform in its operation upon every person
who wishes to engage in the occupation of a liquor dealer.
No person is prohihited by it from obtaining the requisite
number of petitioners or paying his money or receiving a
license, nor is there any locality in the State where he is
forbidden to sell liquors upon complying with the law.
This law is uniform because it operates alike upon all per-
sons in all parts of the State who may desire to engage in
the particular occupation.   McConihe vs. McMurray, 17
Fla., 238, 266, and authorities cited.

Laws imposing conditions and restraints upon the sale
of intoxicating liquors as police regulations have been up-
held everywhere.   The sale of drugs, gun-powder, liquors,
poisons of every kind, is uniformly regulated by placing

conditions and restrictions upon it for the protection of health and morals. Men are not allowed to practice law or physic, or surgery or sell drugs, unless they possess certain qualifications of learning, scientific knowledge, skill, integrity, &c., and in addition may be required to pay a tax or license fee to the government for the privilege of carrying on their special business, in which they are protected by law, and these conditions are sustained by the courts as reasonable and proper for the protection of the public against the mischiefs that may flow from ignorance and quackery, and yet it can scarcely be contended that the laws regulating these matters are not uniform in their operation within the meaning of the Constitution, simply because an ignorant or vicious man may not be able to comply with the conditions essential to the public welfare. The right to impose conditions upon which men may be allowed to engage in a business which is the proper subject of police regulation, as before remarked, have been sustained by the courts everywhere, and as to the extent of the conditions, so long as they do not contravene the constitutional rights of persons, the Legislature alone must limit them.

In the case of The State *ex rel.* Henshall vs. Ludington, 33 Wis., 107, where an act of the Legislature declared it to be unlawful to sell intoxicating liquors without having first obtained a license therefor, and that no person shall be granted a license without giving a bond, " conditioned for the payment of damages to any person which may be inflicted upon or suffered by them, either in person or property or means of support, by reason of so obtaining a license, selling or giving away intoxicating drinks, or dealing therein," and authorizing suits to be brought upon the bond by any person injured by the selling or giving away of intoxicating liquors, Dixon, C. J., delivering the opinion of the court, says: " Counsel for the respondent frankly

concedes the constitutional power of the Legislature to entirely prohibit the selling or giving away of ardent or intoxicating liquors or spirits to be used as a beverage, and attack only certain provisions of the act as being inconsistent with the authority to sell conferred, and repugnant to the constitutional rights of the citizen engaged in an authorized and lawful traffic or business. The point thus yielded, and as to which there would seem to be little room for controversy at the present day, of the general power of the Legislature over the subject acted upon, * * * takes away all grounds of constitutional support for the objections specially urged against particular clauses or portions of the act." The power to prohibit involves " the utmost limit of legislative discretion in prescribing the conditions of sale. * * * It may couple the license with conditions so oppressive, burdensome and unjust that no citizen can afford to apply for or accept the privilege and engage in the business." The court further says : " The subject with which we are dealing is not one of those pertaining to the primary and fundamental rights of the citizen, and as to which no unlimited control has been vested in the Legislature." Counsel " seem to overlook this principal ground of distinction and argue as if the action of the Legislature was an infringement of the natural and inalienable rights of the citizen, declared and guaranteed by the Constitution. * * * Unlike other trades and employments which it is the right of the citizen to pursue undisturbed by arbitrary legislative interference and control, the person who engages in this must, within the limitation above indicated, do so subject to such disadvantages and restraints as may be prescribed by the law-making power which authorizes it." The Constitution of Wisconsin contains no provision relating to the subject of intoxicating liquors or prohibiting the sale thereof. The doctrine of the court is the enuncia-

tion of the general fundamental right of the Legislature to prohibit or restrain by licenses, taxes, &c., and to impose such conditions and safeguards against the abuse of the traffic in an article of the character in question. It is not necessary for us to decide, and we do not decide here, that the traffic in intoxicating liquors may be wholly prohibited, but in the exercise of the police power of the State the Legislature may regulate and restrain it, and this power implies that such conditions may be annexed to the applition for a license as the Legislature may deem reasonable; and if the conditions here annexed are such as may prevent the granting of licenses to immoral or dishonest persons, we have no right to say that the Legislature may not prescribe the qualifications of those who may engage in the occupation of dealers in intoxicating liquors for the protection of the public against the conduct of vicious men who might otherwise engage in the business without restraint, owing nothing to the wholesome public sentiment.

" Those statutes, (says Judge Cooley, Const. Lim., 581,) which regulate or altogether prohibit the sale of intoxicating drinks as a beverage have also been, by some persons, supposed to conflict with the Federal Constitution. Such of these, however, as assume to regulate only and to prohibit sales by other persons than those who should be licensed by the public authorities, have not suggested any serious question of constitutional power. * * * The same laws have also been sustained when the question of conflict with State Constitutions or with general fundamental principles have been raised. They are looked upon as police regulations, established by the Legislature for the prevention of intemperance, pauperism and crime, and for the abatement of nuisances." Id., p. 583, citing decisions from Massachusetts, Iowa, Connecticut, Michigan, Illinois, Vermont, Indiana, New York and other States.

In the following cases laws referring to the people of towns and other localities the question whether licenses should be therein granted to sell intoxicating liquors have been sustained : Com. vs. Deans, 110 Mass., 357 ; Com. vs. Bennett, 108 Id., 27 ; Com. vs. Turner, 1 Cush., 493 ; State vs. Wilcox, 42 Conn., 364; State vs. Court Com. Pleas, 36 N. J. Law, 72 ; Locke's Appeal, 72 Pa. St., 491 ; Anderson vs. Com., 13 Bush. Ky., 485.

In the case of Anderson vs. Commonwealth the court unanimously hold " that the sale by retail of intoxicating liquors may be constitutionally regulated; and that in localities, where in the opinion of the Legislature or of its constitutionally organized agencies, the peace and good order of society so require, license to carry on the retail traffic may be refused altogether. * * * And further, that the Legislature may create other agencies to determine the local question, and that it is no constitutional objection to the agencies created by the act under consideration that they are composed of the body of the qualified voters of the city, town or civil district in which the necessary steps may be taken to test the sense of such voters on the subject of such retail traffic."

This decision expresses the views of many courts which have had the question before it, and the same rule would sustain the act under consideration. The Supreme Court of Indiana in Groesch vs. The State, 41 Ind., 547, holds that the Constitution does not require that the operation of laws throughout the State shall be uniform in any other sense than that their operation shall be the same in all parts of the State, under the same circumstances and conditions. The act under consideration in that case required any person desiring a permit to sell intoxicating liquors as a beverage to file in the Auditor's office a petition praying such permit, stating among other things that he is a proper per-

son to receive such permit, which petition shall be signed by the applicant and also by a majority of the legal voters resident in the ward or township where the applicant proposes to sell such liquors.   The Board of Commissioners on being satisfied' that the petition is in proper form, and that it has been signed as required, shall direct a permit to be issued by the Auditor upon his complying with the provisions of the act, paying for the permit and giving bond as required by law.   Says the court: "Thus the qualifications and fitness of each person, as well as the wish of the petitioners for the establishment of the business in their neighborhood, are at once settled by the voice of those who are most intimately concerned.   If they do not thus open the door to the traffic the law provides that, so far as the applicant is concerned, it shall remain closed."   The compliance with such conditions, the court says, has not been considered as involving the exercise of legislative functions, and the act is general in its application to every locality, and uniform in its operation.   The people in their sovereign capacity do not enact or give vitality to the law or nullify it, but aid in its enforcement.

A law similar to this was also adjudicated upon in House vs. The State of Mississippi, 41 Miss., 737, where it was decided that the power to grant such licenses must be exercised in accordance with the requirements of the act, " and a grant of license without a petition of a majority of the legal voters resident within the city is null and void." To the same effect see Rohrbacher vs. Mayor, &c., 51 Miss., 735, 743.

It is further urged with great tenacity on the part of the relator that the act under consideration is in violation of the fourteenth amendment to the Constitution of the United States, which runs thus: "All persons born or naturalized in the United States, and subject to the jurisdiction

thereof, *are citizens of the United States* and of the State where they reside."

" *No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ; nor shall any State deprive any person* of life, liberty or *property without due process of law*, nor deny to any person within its jurisdiction the equal protection of the laws."

A case came before the Supreme Court of the United States, reported in 18 Wallace, 129, (Bartemeyer vs. Iowa) in which was involved the right of the State to regulate the traffic in intoxicating liquors, and it was urged that such a law was void as violating the privileges or immunities of citizens of a State or of the United States. The court says : " We think that the right to sell intoxicating liquors, so far as such a right exists, is not one of the rights growing out of citizenship of the United States." Mr. Justice Bradley, in a concurring opinion, says : " The law was not in this case an invasion of property existing at the date of its passage, and the question of depriving a person of property without due process of law does not arise. No one has ever doubted that a Legislature may prohibit the vending of articles deemed injurious to the safety of society, provided it does not interfere with vested rights of property. When such rights stand in the way of public good they can be removed by awarding compensation to the owner. When they are not in question a claim of a right to sell a prohibited article can never be deemed one of the privileges and immunities of the citizen."

Mr. Justice Field, concurring also in the opinion of the court, says : " The prohibition of sale in any way or for any use is quite a different thing from the regulation of the sale or use so as to protect the health and morals of the community. I have no doubt of the power of the State to regulate the sale of intoxicating liquors where such regula-

tion does not amount to the destruction of the right of property in them. * * No one has ever pretended, that I am aware of, that the fourteenth amendment interferes in any respect with the police powers of the State. Certainly no one who desires to give to that amendment its legitimate operation has ever asserted for it any such effect. It was not adopted for any such purpose. The Judges who dissented from the opinion of the majority of the court in the *Slaughter House Cases* never contended for any such position. But, on the contrary, they recognized the power of the State in its fullest extent, observing that it embraced all regulations affecting the health, good order, morals, peace and safety of society, that all sorts of restrictions and burdens were imposed under it, and that when these were not in conflict with any constitutional prohibition or fundamental principles they could not be successfully assailed in a judicial tribunal."

This decision of the Supreme Court of the United States would seem to so cover the question made under the fourteenth amendment that nothing further need be said. Counsel, however, call our attention to a decision of the Circuit Court of the United States for the District of California in a case involving the constitutionality of a revenue law of that State, in which the opinion was filed in September last. The case was that of The County of San Mateo vs. The Southern Pacific R. R. Co., reported in 13 Federal Reporter, 723. We quote some portion of the opinion to which our attention is directed. Mr. Justice Field says: " The fourteenth amendment of the Constitution in declaring that no State shall deny to any person within its jurisdiction the equal protection of the laws, creates a limitation upon the exercise of all the powers of the State which can touch the individual or his property, including among them that of taxation. Whatever the

State may do it cannot deprive any one within its jurisdiction of the equal protection of the laws; and by equal protection of the laws is meant equal security under them to every one, on similar terms, in his life, his liberty, his property, and in the pursuit of happiness. It implies not only accessibility by him, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs and the enforcement of contracts, but also an exemption from any greater burdens or charges than such as are equally imposed upon all others under like circumstances. * * * Unequal exactions in every form, or under any pretence, are absolutely forbidden. * * * Taxation on business in the form of licenses may also vary according to the calling or occupation licensed and the extent of business transacted; but even then there must be uniformity of charges with respect to the same calling or occupation in the same locality. * * * It (the 14th amendment) does not, indeed, place any limit upon the subjects in reference to which the States may legislate. It does not interfere with their police power. Upon every matter upon which, previously to its adoption, they could act, they may still act. They can legislate now, as they always could, to promote the health, good order and peace of the community; to develop their resources, increase their industries and advance their prosperity; but it does require that in all such legislation hostile and partial discrimination against any class or persons shall be avoided; that the States shall impose no greater burdens upon any one than upon the rest of the community under like circumstances; nor deprive any one of rights which others similarly situated are allowed to enjoy. It forbids the State to lay its hand more heavily upon one than upon another under like conditions. It stands in the Constitution as a perpetual shield against all unequal and

partial legislation by the States, and the injustice which follows from it, whether directed against the most humble or the most powerful, against the depised laborer from China or the proud master of millions."

We fail to discover in the paragraph quoted, or in any part of the text of the opinion referred to, that the fourteenth amendment places any obstacle in the way of the right of States to legislate in respect of the regulation of traffic in intoxicating liquors or the exercise of any of the recognized police powers. They remain as before the adoption of the amendment. The amendment requires that all citizens shall be amenable to the same laws. The argument that every man in the community has the right to engage in any kind of business he may choose, and that the Legislature may not impose conditions in respect to the exercise of such right, especially in business that has always been the subject of police regulation and restriction, goes as well against the power of the State to impose any restriction, even the asking for a license, as against the conditions imposed by the act in question. The opinion of Justice Field in the California tax case agrees with that of all the Justices in the case in 18 Wallace, that the fourteenth amendment does not affect the police powers of the States, as they existed before the adoption of the amendment; nor the power of the States to impose taxes and regulations upon property or business, " provided they lay no greater burden upon any one than upon the rest of the community under the like circumstances; nor deprive any one of rights which others similarly situated are allowed to enjoy." See, also, Missouri vs. Lewis, 11 Otto, 22, 31.

As was said by the court in Iowa (*In re.* Ruth, 32 Iowa, 252,) in regard to the license law of that State, a preventive restriction is thrown around the sale by permitting men of good moral character alone to deal in this article. Coun-

sel exclaim, "Have not men of bad moral character the same rights as men of good morals?" Undoubtedly, all men are equal before the law in respect of the right of person and property, but every man who desires to engage in the business must submit to the terms prescribed by the law. Certain poisons are property, but the sale of them may be restricted to certain persons, namely: those having sufficient intelligence to know when they ought to be used, and of sufficient character for prudence to give assurance that these agents will not be carelessly administered. Intoxicating liquors have uniformly been held to be proper subjects of police surveillance, and the sale of them guarded and restrained by regulations prescribed by the Legislature.

We find that the act of March 3, 1883, (except Sections five and six, which may be stricken out without impairing the efficacy of the act or the object of enacting it,) is not obnoxious to any provision of the Constitution of this State or of the United States.

The motion to quash the alternative writ is granted.